**Harry HALPERN, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. 10148.**

United States District Court, E. D. New York.

March 16, 1955.

---

northbound and three southbound traffic lanes, which are separated by a grass-covered mall. The aggregate width of the northbound lanes is approximately forty feet.

U. S. Route 40 is a two lane highway, running generally east and west, at right angles, or nearly so, to U. S. Route 13. It provides one lane for eastbound and another for westbound traffic.

The flow of traffic at the intersection was regulated by two traffic lights, one located over the center of the northbound and the other over the center of the southbound roadway.

There was no regularly timed change of traffic lights at the intersection. It appears that the light remained green for traffic along Route 13, and when a westbound car on Route 40 approached the intersection it would pass over a treadle, whereupon, after a lapse of several seconds, a cycle of light changes controlling traffic on Route 13 was set in motion, first to amber, then to red, and finally back to green, thus permitting westbound vehicles to cross the northbound lanes of traffic on Route 13.

The plaintiff's automobile was being driven by one Irving Goldstein, with the plaintiff seated at his right. It was traveling west and came to a stop about ten feet behind another passenger automobile which had stopped at the intersection, waiting for a change of traffic lights in favor of westbound traffic before proceeding to cross Route 13.

The United States Army bus driven by Private Monnett was the 27th or 28th vehicle of a thirty-bus convoy, which was proceeding in a northerly direction along U. S. Route 13.

Weather conditions were rather poor. According to the report of the weather bureau (Defendant's Exhibit A) based on observations made and records kept at the Newcastle County Airport, one mile from the scene of the accident, snow fell from 9:40 a. m. to 10:15 p. m. on that day; at 1:15 p. m., there was a "trace" of snow on the ground, and at 7:15 p. m. about five inches. Visi-

Selkowe, Johnson, Zimbalist & Romanoff, Samuel A. Zimbalist, New York City, for plaintiff.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., Margaret E. Millus, Brooklyn, N. Y., for defendant.

RAYFIEL, District Judge.

At about 2:40 p. m., on February 10, 1949, the plaintiff's automobile, a 1948 Chevrolet sedan, and a bus, owned by the defendant, and operated by one Private Jerry R. Monnett, of the United States Army, were in collision, and plaintiff brought this action to recover for the resultant damage to his automobile and the injuries sustained by him.

The collision occurred at the intersection of U. S. Route 13 and U. S. Route 40, in the vicinity of a place known as Hare's Corner, near the city of Wilmington, in the State of Delaware.

U. S. Route 13 is a six lane highway and runs north and south. It has three

bility—and this may have been based on observations made at some distance above ground level—was reduced by snow to "½ mile or more from 1:38 to 4:07 p. m."

Sergeant Edward N. Outten, of the Delaware State Police, who arrived at the scene of the accident about ten minutes after it occurred, testified in his deposition (Plaintiff's Exhibit 2) that it was snowing at the time of the accident, and that the highway (U. S. Route 13) was slushy as a result of the traffic.

According to the "Transcript of Operator's report of Motor Vehicle Accident" (Plaintiff's Exhibit 5) the following appear to be some of the facts concerning the condition of the highway and the operation of the U. S. Army bus prior to the collision. Private Monnett was driving north on U. S. Route 13. Under orders of his convoy commander he was directed "to keep up with the Government vehicle directly ahead of me in the convoy through traffic lights, stop signs and all. Just keep closed up, was my orders. I was doing just that, when vehicle No. 2 (Plaintiff's car) tried to cut across the convoy. My W/S (windshield) was covered with snow and ice, and I was going pretty fast, and did not see veh. No. 2, * * *" (Matter in parenthesis added) Monnett maintained a speed of 55 miles per hour up to the very moment of the collision, although, as the report states, the condition of the road was "wet, icy, snowy". Captain Harry C. Trodick, of the United States Army, who reviewed the report, stated therein that "The cause was too much speed considering the bad weather. The accident could have been prevented had the officer in charge used more discretion in the speed of the lead vehicle." (of the convoy)

At page 11 of his deposition Sergeant Outten stated that the maximum rate of speed on Route 13 was 55 miles per hour. On pages 34 and 35 thereof the following questions and answers appear.

"Q. Now, Sergeant, do the laws of the State of Delaware with respect to speed on the highways limit or curtail the rate of speed in the event weather conditions increase the hazard on the highways? A. That's right, sir.

"Q. Is that speed reduced to a rate of speed which would be considered reasonable and careful under the weather conditions and road conditions then prevailing? A. Yes, sir.

"Q. If a person were to travel at a speed of 55 miles an hour at Hare's Corner on February 10, 1949, under the weather conditions as you observed them at the time that you approached Hare's Corner at about 2:45 p. m. would that be a safe rate of speed? A. It would not, sir."

Further on in his deposition (Page 46) Sergeant Outten stated that in the course of a conversation he had with Private Monnett shortly after the accident the latter told him that the traffic light was red as he entered the intersection.

The deposition of Monnett was taken on January 13, 1954, about five years after the accident. His testimony manifested such indecision, evasiveness and lack of forthrightness as to make it unworthy of serious consideration. He answered "I don't recall", or some equivalent, to a majority of the questions asked of him. He was quite sure, however, that the light controlling traffic on U. S. Route 13 was either green or amber immediately prior to or at the time of the collision, although, when questioned by Sergeant Outten shortly after the accident, he stated that it was red. He testified that on several occasions during the run of the convoy he was obliged to stop to clear the windshield of his bus of an accumulation of snow and ice, indicating that visibility was poor.

By reason of the contradictions in his testimony respecting the color of the traffic lights at the intersection immediately prior to and at the time of the accident, and the irreconcilability thereof with the documentary evidence, it is difficult to resolve that question, but I have

no doubt that the collision resulted from the fact that Monnett drove the bus in a negligent manner and at greatly excessive and unsafe speed, more particularly so because of the prevailing road and weather conditions and the poor visibility occasioned by the accumulation of snow and ice on the windshield.

By reason of the foregoing the plaintiff would be entitled to a recovery if the operator of his automobile was free from contributory negligence. What, then, are the facts with respect thereto? At the time of the collision the plaintiff's car, as hereinbefore stated, was being driven by one Irving Goldstein. He testified at the first trial of this action, which resulted in a mistrial, but not at the second. A transcript of the record of his testimony was received in evidence as Defendant's Exhibit F.

Goldstein testified that he had been driving the car in a westerly direction along U. S. Route 40, and brought it to a stop about ten feet behind another car which was facing the intersection of U. S. Routes 13 and 40, apparently waiting for a change in traffic lights before proceeding to cross Route 13.

The following appears on page 7 of the transcript of Goldstein's testimony on cross-examination.

"Q. You state then the light turned green, and the car before you moved out. Did that car move across the northbound lane of Route 40? (the questioner meant Route 13) A. When the light turned from yellow to green, when the light turned green in my favor, the car in front of me went on, and I followed him in back of him.

"Q. How far behind him? A. I was about ten feet behind him.

"Q. How far behind him were you at the moment of impact? A. At the moment of impact I was still ten feet behind him, * * *."

It would appear, then, that the bus must have barely missed striking the car which had stopped immediately in front of the plaintiff's, since the bus (see Defendant's Exhibit D) was eight feet wide.

Later (Page 7 of the transcript) he was asked:

"Q. Did you look to the left and right prior to entering the intersection of Route 40 with Route 13? A. No, sir, I looked straight ahead.

"Q. You looked neither to your left nor to your right? A. No sir, I didn't."

Sergeant Outten, at page 43 of the transcript of his deposition, said that on the day of the accident a driver, westbound on Route 40, upon reaching the intersection, could see traffic moving northbound on Route 13.

In the case of Odgers v. Clark, 1941, 2 Terry 232, 41 Del. 232, 19 A.2d 724, 726. The Superior Court of Delaware held that "It is a well recognized rule of law that the duty rests upon the operator of a motor vehicle to always keep and maintain a proper lookout for persons, vehicles and the property of others upon any and all highways and streets of this State, and by this is meant that the duty of looking implies at all times the duty to see what is in plain view or sight, * * *."

During his direct examination Goldstein was asked: (Page 9)

"Q. How far into the intersection did you get before you were struck? A. I didn't get very far, seeing that I was still in first gear. I must have gotten about five or ten feet, say, say about ten feet, I would say, maybe a foot more or less, I wouldn't know."

Later, he was asked by the Court (Page 12 of transcript)

"Q. Where were you when you were struck? His answer was: I was in the first lane in the intersection when I was struck," indicating that the plaintiff's car had barely entered Route 13.

Goldstein's testimony, as a whole, was, to say the least, far from convincing.

The plaintiff failed, also, to establish to my satisfaction that the light was green facing Route 40, and favoring westbound traffic, just prior to the accident.

There is some evidence in the record to the effect that the light controlling traffic on Route 13 turned red when, or immediately after, Monnett entered the intersection, at which time, it may be inferred, the light turned green for westbound traffic on Route 40. Granting that that was true—and I am not satisfied that it was—the Delaware statute regulating traffic at intersections controlled by lights provides that traffic facing the green light or "go" signal may proceed, except that vehicular traffic so proceeding shall yield the right of way to vehicles lawfully within the intersection at the time such signal is exhibited.

In the case of Spence v. Waters, 9 W. W.Harr. 582, 39 Del. 582, 4 A.2d 142, the court stated, quoting from Byrne v. Schultz, Inc., 306 Pa. 427, 160 A. 125, " 'The law only makes obligatory the rule of common sense regarding the duty of a driver at the intersection of streets, where traffic is very dangerous because conflicting. He must be vigilant, must exercise a high degree of care, must have his car under complete control, and must look, and see what is visible, before attempting to cross an intersecting street * * *. The signal to cross (traffic light) is not a "command to go, but a qualified permission," and the qualification is "to proceed lawfully and carefully," as a prudent man would under the circumstances * * * which certainly requires looking to the right and left before entering upon the intersecting street.' "

■ Despite the negligence of the defendant the plaintiff may not recover if the accident would not have occurred but for his negligence. In the case of Willis v. Schlagenhauf, 8 W.W.Harr. 96, 38 Del. 96, 188 A. 700, 702, the Court stated in his charge to the jury, "So, likewise, the plaintiff may not hold the defendant responsible in damages if his own conduct does not measure up to the same standard, if that conduct produces or helps to produce the injury and damage, and but for which the injury would not have occurred", and in the case of Burk v. Artesian Water Co., 8 Terry 405, 47 Del. 405, 91 A.2d 545, 548, the court stated " * * * it appears that there was contributory negligence by the plaintiff, consequently he would not be allowed to recover regardless of the negligence of the defendant" and "When one fails to use his senses for his own protection he is guilty of negligence and has no redress."

■ The contributory negligence of the driver of the plaintiff's automobile is attributable to the plaintiff since he had control over Goldstein and could have demanded and obtained physical possession of the car and its controls.

In the case of Jacobs v. Pennsylvania Railroad Co., 3 Cir., 90 F.2d 329, 330, the Court said: "From the proofs it appears the driver of the car was the servant of Jacob Jacobs, one of the plaintiffs. At the time of the accident he was under the direction of Mrs. Jacobs. Consequently, if the driver was guilty of negligence which caused the accident, such contributory negligence on his part is ascribed to both Mr. and Mrs. Jacobs, and she cannot recover for the injury to herself or for the death of her child, nor can her husband, for the same reason, recover in those particulars."

Accordingly, judgment is rendered in favor of the defendant, dismissing the complaint herein.

Submit proposed findings of fact, conclusions of law and decree in conformity herewith.