**Joseph C. TROPEA, Plaintiff-Appellee,**

v.

**SHELL OIL COMPANY and Maripet Supply Corporation, Defendants-Appellants.**

**No. 26981.**

United States Court of Appeals Second Circuit.

Argued Feb. 9, 1962.

Decided Aug. 13, 1962.

758

Lumbard, Chief Judge, dissented.

Sargent & Sand, New York City (Benjamin Heller, New York City, of counsel), for plaintiff-appellee.

Terhune, Gibbons & Mulvehill, New York City (Edmund J. Fanning, Patrick E. Gibbons, New York City, of counsel), for defendant-appellant Shell Oil Company.

Lawless & Lynch, Purdy, Lamb & Catoggio, New York City (Edmund F. Lamb, William E. Fay, III, New York City, of counsel), for defendant-appellant Maripet Supply Corporation.

Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

WATERMAN, Circuit Judge.

The plaintiff, Joseph C. Tropea, brought the present action against the defendants, Shell Oil Co. (Shell) and Maripet Supply Corp. (Maripet) for personal injuries allegedly caused by the negligence of one of Maripet's employees. Shell cross-claimed against Maripet for whatever amount the plaintiff might recover against Shell. After trial by jury in the Eastern District of New York, judgment was entered for the plaintiff upon a jury verdict against both defendants in the sum of $35,000 and judgment over was granted by the trial judge for the defendant Shell against the defendant Maripet. Shell and Maripet appealed from the respective judgments against them.

The plaintiff was the manager of a gasoline station at 11th Avenue and 43rd Street in Manhattan. The station had been leased to the plaintiff's employer, Aeroflex Corp., by the defendant Shell. Under its lease to Aeroflex Corp., Shell reserved the right "to inspect, repair and paint the equipment, and to enter the premises at any time for such purposes." Shell did not use its own employees or agents to do this work. Instead it engaged an independent contractor, Maripet, for this purpose. Whenever the station's equipment needed attention, the manager of the station would call Shell, and Shell in turn would give the order to Maripet to perform the requested work.

The physical arrangement of the drainage system connecting the wash bay with the grease pit at this gasoline station is of importance for an understanding of the events here at issue. The drain pipe from the wash bay leads straight down for about six feet. Then it makes a ninety degree angle and passes into a catch basin at a level three inches beneath the drain in the grease pit. The exit pipe from this catch basin is opposite the inlet pipe from the wash bay and, therefore, is also three inches below the grill of the drain in the grease pit. The bottom of the catch basin is about six inches beneath the grill. This construction allows about 192 cubic inches of fluid and sediment to remain in the catch basin at all times. The exit pipe leads to a catch basin at the far wall of the building and thence into the sewer system.

There is some dispute in the evidence as to the circumstances of the accident that gave rise to this lawsuit. The evidence most favorable to the plaintiff, which we must now accept, supports the following account of what happened. On November 5, 1958, the plaintiff informed Shell that one of the fuel pumps was in need of repair. Between 11:00 and 11:30 that morning an employee of Maripet, one Tonri, came to the plaintiff's station and fixed the pump. While Tonri was there, the plaintiff asked him to check the fuel storage tanks for water. Tonri complied and found water in the tanks. The plaintiff then asked Tonri if he would remove this water from the tanks. Tonri again consented, and, upon being asked if Tropea should call Maripet about this additional work, he replied that calling would be unnecessary. Tropea did not see any drum on Tonri's truck for carrying away the water to be removed from the fuel tanks.

The maintenance man commenced to pump the water from the tanks by means of a hand pump which he had brought with him. He discharged it into a five-gallon can. Then he carried the can to the station's wash bay where he poured

the liquid down the drain. After this he took the empty can back to the fuel tank for another load of water. He repeated this process about five times until all the water was removed from the fuel tank, the whole procedure taking about one hour. During this operation Tonri saw the plaintiff from time to time. At trial Tonri asserted that the plaintiff told him to dump the contents of the can down the wash bay drain, but the plaintiff testified that he gave no instruction whatsoever concerning the disposal of the water.

While Tonri was performing the above operation one of the plaintiff's employees, Torres, was working in the wash bay. After Tonri brought in the first load from the tank, Torres could smell gasoline present, and he said to Tonri:

"You'll have to excuse me, because this is not only water, this is also gasoline in there."

Tonri replied: "Well, what are you? A wise guy, trying to tell me what to do now?"

Torres: "No, I'm not trying to tell you what to do. But suppose somebody comes in here and drops a cigarette or match and the place goes on fire? I'll burn myself in here. And the coveralls will burn."

The maintenance man said: "Oh, I've been doing this for years. Never mind. Don't worry about it."

The owner of the gasoline station across the street was also present at the Aeroflex station that day. He observed the Maripet man, Tonri, pumping out the fuel tanks and smelled gasoline in the liquid being pumped.

After asking Tonri to pump the water from the storage tank, Tropea resumed his other duties as manager of the station. First he did some work in the parking lot. Next he took an automobile for a road test. Then he placed an automobile over the grease pit, which was adjoined to the wash bay where Tonri had been dumping the liquid from the fuel tanks but separated from that wash bay by a curtain. He then entered the grease pit beneath the car and proceeded to remove the cable from the car's starter bolt. No lubrication or oil changing had been done in the pit that day.

When the plaintiff pulled the cable from the starter bolt a spark was created. Suddenly, flames gushed up from the drain of the pit. The entire grease pit was enveloped in fire. Tropea, screaming, his clothes on fire, struggled out of the fiery pit. Torres, hearing Tropea's screams, rushed to his rescue, and by means of a fire extinguisher put out the flames on Tropea's clothing. Another employee immediately took Tropea to the hospital. Tonri, about to leave the premises, was putting his equipment onto his truck when the fire broke out. Tropea was severely burned.

About ten minutes after the accident an officer of Aeroflex Corporation, one Robinson, came to the station to inspect the damage. In the catch basin beneath the grease pit he discovered a mixture which he believed contained at least fifty per cent gasoline. Also, he noticed the odor of gasoline in the pit. The paint on the walls of the pit had been blistered by the intense heat of the fire. The under surface of the car which had been over the pit at the time of the fire, and which had been promptly pushed from the pit, was only slightly scorched.

Plaintiff's evidence tended to show, through the testimony of Robinson and another witness, one Acerno, that it was the custom in the trade to put liquid that had been pumped from fuel tanks into drums and to take these drums away from the premises by trucks. Defendants, through two other witnesses, denied that such a custom existed.

We shall first deal with the contentions of Maripet, supported by Shell, that a directed verdict or judgment n. o. v. should have been entered against the plaintiff, but, if not, a motion for a new trial should have been granted. They argue that the legally admissible evidence was insufficient to establish actionable negligence on the part of Maripet's employee, Tonri, and, furthermore, that the evidence was insufficient to es-

tablish the plaintiff's own freedom from his contributory negligence. Additionally, they maintain that the judge below committed reversible error in not giving the jury instructions that Maripet requested be charged, and in not granting a motion for a mistrial because of the plaintiff's attorney's references within the hearing of the jury to the plaintiff's dependent children. They also assert that the verdict was excessive and the judgment thereon should be set aside.

The following questions are raised by Maripet's claim that under the applicable New York State law of negligence plaintiff is not entitled to recover. First, did the admissible evidence establish that Maripet's employee failed to exercise due care? Second, did the admissible evidence establish that Tonri's conduct in washing the fluid down the drain was a cause in fact of the plaintiff's injury? Third, was the plaintiff within the class of persons to whom the law gives relief against the defendant for its negligence, and was the particular harm the plaintiff suffered an injury within the risk the defendant is required by law to avoid creating? Fourth, did the admissible evidence establish that the plaintiff was free from contributory negligence? An answer favorable to Maripet on any one of these questions would require a reversal.

██ Whether Tonri, Maripet's employee, was exercising due care, i. e., was acting as a reasonable man under the existing circumstances, was mainly a question for the jury, which found that he was not exercising due care. There was evidence to support this finding. Tonri was warned by Torres that it was improper to wash down the drain what was pumped from the tank, and there was testimony that it was a custom in the industry to carry off the waste water in trucks instead of washing it down the drain. It is well established that a general practice in a particular trade is relevant in order to prove that one following the practice exercised due care or that one not following it failed to exercise

due care. Garthe v. Ruppert, 264 N.Y. 290, 190 N.E. 643 (1934); Shannahan v. Empire Engineering Corp., 204 N.Y. 543, 98 N.E. 9, 44 L.R.A.,N.S., 1185 (1912).

██ Maripet contends, however, that the witnesses produced by the plaintiff to testify to the custom of the trade were incompetent to give testimony on this subject. The plaintiff's two witnesses, Acerno and Robinson, testified that the custom in the trade was not to wash the fluid pumped from the tanks down the drain but instead to carry the mixture away in a container. Acerno had operated service stations, selling various brands of gasoline, in a number of locations in the New York metropolitan area for approximately twenty years. He was accordingly familiar with the methods used by various firms for pumping out waste from fuel tanks. Therefore, he was competent to testify as to the custom of the trade. The other witness, Robinson, an official of Aeroflex Corporation, had had general supervisory authority over two Aeroflex service stations for six years. He had only seen water pumped from fuel tanks on three or four occasions, all of which were at stations operated by Aeroflex and serviced by Esso Standard Oil Company. The determination as to a witness's qualifications as an expert is a matter committed to the discretion of the trial judge, and his decision will only be upset on appeal for an abuse of that discretion. Olsen v. Realty Hotel Corp., 210 F.2d 785 (2 Cir. 1954). There was no abuse of discretion here. Even if Robinson lacked the personal experience necessary to qualify him as an expert on the custom of pumping out waste liquid from fuel tanks in the service station trade, his testimony was not so prejudicial to Maripet that its introduction requires a reversal, for it was only cumulative to that of Acerno, whose testimony was obviously competent. Moreover, the trial judge gave a clear and careful instruction to the jury that it was its duty to decide whether the custom to which these witnesses testified did in fact exist.

■ The cases relied upon by Maripet do not support its contention that the trial judge committed error in admitting the testimony of both of the plaintiff's expert witnesses. Olsen v. Realty Hotel Corp., supra, involved the exclusion below of expert testimony, and we held that the exclusion ruling was a proper exercise of discretion. Garthe v. Ruppert, 264 N.Y. 290, 190 N.E. 643 (1934), apparently did not involve the qualification of an expert witness. Chateaugay Ore & Iron Co. v. Blake, 144 U.S. 476, 12 S.Ct. 731, 36 L.Ed. 510 (1892) is far afield. It involved testimony concerning a certain local custom for the purpose of interpreting a written contract between the parties. And in Dillon v. Socony Mobil Co., 9 A.D.2d 835, 192 N.Y.S. 2d 818 (1959), the witness whose testimony was held to be incompetent lacked expertise in the particular industry involved in that case. Here it was not reversible error to admit the testimony of both of the plaintiff's witnesses as to the custom of the trade. The plaintiff's evidence tended to prove the existence of such a custom, and presented to the jury questions of fact for resolution whether, first, there was such a custom, and second, if there were, whether a failure to follow it demonstrated that there had been a failure by Maripet's employee to exercise due care.

Next, Maripet contends that Tonri's conduct in washing the mixture down the drain was not a cause in fact of Tropea's injury. Maripet asserts that the fire could have started from a break in the fuel line of the car under which the plaintiff was working. The defendant also suggests that the fire could have originated from the igniting of oil or grease on the plaintiff's clothes or in the pit. Part of the evidence at the trial supports Maripet's hypotheses. Tropea's hands suffered especially bad burns, and he testified that he did not smell gasoline fumes when he entered the pit. Moreover, the fire did not burn back to the wash bay drain from the catch basin beneath the grease pit drain.

On the other hand, the plaintiff's theory was that the fire was caused by gasoline fumes rising from the gasoline that Tonri had washed down the drain, and there was substantial evidence to support the theory. The plaintiff testified that the whole pit burst into flames that seemed to have come initially from the grease pit drain. Grease and oil are an unlikely source of such a fire. Moreover, there was testimony that grease and oil were never allowed to remain on the floor of the pit, and, furthermore, that no lubrication or oil changes had been performed in the pit that day. Robinson testified that when he inspected the pit shortly after the accident he smelled the odor of gasoline fumes, and he found a high percentage of gasoline in the sediment in the catch basin beneath the drain. Also, though the walls of the pit were severely scorched, the automobile over it was only slightly scorched, suggesting that the automobile was not the source of the gasoline that fed the fire. Finally, the fire was put out promptly with fire extinguishers, and there was a large accumulation of water in the sediment beneath the grease pit drain. Either of these circumstances could have prevented a fire that started in the grease pit from flaming back into the wash bay area.

■ Maripet cites several cases which support the following proposition found in Digelormo v. Weil, 260 N.Y. 192, 199–200, 183 N.E. 360, 362–363 (1932):

"The law is that where the evidence is capable of an interpretation which makes it equally consistent with the absence as with the presence of a wrongful act, that meaning must be ascribed which accords with its absence. In other words, it can only be established by proof of such circumstances as are irreconcilable with any other theory than that the act was done. Lopez v. Campbell, 163 N.Y. 340, 57 N.E. 501; Specht v. Waterbury Co., 208 N.Y. 374, 102 N.E. 569; Ruppert v.

Brooklyn Heights R. R. Co., 154 N. Y. 90, 47 N.E. 971. The rule is well settled that where there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving the injury was sustained wholly or in part by a cause for which the defendant was responsible. Ruback v. McCleary, Wallin & Crouse, 220 N.Y. 188, 115 N.E. 449."

See Cole v. Swagler, 308 N.Y. 325, 125 N.E.2d 592 (1955); Kelly v. Otis Elevator Co., 283 App.Div. 363, 128 N.Y.S. 2d 39 (1954), aff'd 308 N.Y. 805, 125 N.E.2d 864 (1955). The plaintiff replies with cases supporting this somewhat contrary proposition found in Rosenberg v. Schwartz, 260 N.Y. 162, 166, 183 N.E. 282, 283 (1932), decided by the same court and in the same year as was Digelormo v. Weil, supra.

"The jury might reasonably have found that the plaintiff's injury was the direct result of the defendant's negligence. The plaintiff was not required to offer evidence which positively excluded every other possible cause of the accident."

See Klein v. Long Island R.R., 199 Misc. 532, 99 N.Y.S.2d 50, aff'd, 278 App.Div. 980, 105 N.Y.S.2d 999 (1951), aff'd, 303 N.Y. 807, 104 N.E.2d 364 (1952); Trimble v. City of New York, 275 App.Div. 169, 171, 88 N.Y.S.2d 324 (1949). But in not one of these cases cited by either side were the fact patterns very similar to the present case. Evidence sufficient to support a verdict always depends upon the factual peculiarities of the particular lawsuit. Therefore, the precedents cited by both of the parties are of little help in answering the question whether the evidence in this particular case was sufficient to support the jury finding below. It appears to us that this jury reasonably could have found on the evidence before it that the washing of waste water down the drain caused the plaintiff's injury.

Maripet claims, however, that it was also incumbent upon the plaintiff to call an expert witness to testify to the fact that gasoline mixed with water in a 192 cubic inch catch basin could have produced a sufficient density of fumes in a 600 cubic foot pit to start a fire in that pit upon the striking of a spark 6 feet above the catch basin. In the light of the other and more direct evidence of causation testified to by the eye-witnesses in this case, we do not hold that it was essential for the plaintiff to call an expert witness on this issue. This is not one of those rare causes of action in which the law predicates recovery upon the testimony of an expert. See Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962), citing 7 Wigmore, Evidence §§ 2090, 2090a (3d ed. 1940). The question here was not so technical that a jury would have been unable to answer it intelligently without the aid of expert testimony.

Having decided that the evidence supported the jury's findings that Maripet's employee failed to exercise due care and that this conduct caused injury to the plaintiff, we turn now to the issue whether defendant's duty not to be negligent extended to the plaintiff and included a duty to avoid inflicting upon him the specific injury he suffered. To determine this, we must ask *why* the defendant's employee's act was negligent. The reason for this inquiry is that the scope of the defendant's duty not to be negligent only includes the persons who are foreseeably endangered by the conduct of the defendant's employee and extends to them only for harm arising from the particular foreseeable hazard, the likelihood of the occurrence of which causes the employee's conduct to be negligent conduct. 2 Harper & James, Torts §§ 18.2, 20.5 (1956). This is the prevailing view in New York as well as elsewhere. See Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99, 59 A.L. R. 1253 (1928); Kinderavich v. Palmer, 127 Conn. 85, 15 A.2d 83 (1940); Sinram v. Pennsylvania R. R., 61 F.2d 767 (2 Cir. 1932); Ross v. Hartman, 78 U.S. App.D.C. 217, 139 F.2d 14, 158 A.L.R. 1370 (1943), cert. den., 321 U.S. 790, 64

S.Ct. 790, 88 L.Ed. 1080 (1944); Waube v. Warrington, 216 Wis. 603, 258 N.W. 497, 98 A.L.R. 394 (1935); 2 Restatement, Torts §§ 281, 430 (1934); 2 Harper & James, op. cit. supra at 1018–19, 1022, 1136; Seavey, Mr. Justice Cardozo and the Law of Torts, 52 Harv.L.Rev. 372, 48 Yale L.J. 390, 39 Colum.L.Rev. 20 (1939); 38 Am.Jur., Negligence §§ 14, 18, 23, 24; 65 C.J.S. Negligence § 4, p. 339. But see Prosser, Torts, § 31 at 186 (1941). Thus the extent of the defendant's liability turns on what was foreseeable by a prudent man in the defendant's position at the time and place of the accident. But foreseeability is not a term of precision. 2 Harper & James, op. cit. supra at 1149. All authorities agree that the specific risk or consequence which occurred need not have been foreseen for the court to impose liability. Instead all that is required for liability is that the risk of injury to the plaintiff be foreseeable *in a general way*. Id. at 1147; see Pollock, Liability for Consequences, 38 L.Q.Rev. 165, 167 (1922); 2 Restatement, Torts § 435 (1934); cf. Hill v. Winsor, 118 Mass. 251 (1875). On the other hand, of course, the definition of the relevant risk must not be drawn too broadly, otherwise there would be virtually no limitation on the scope of the defendant's duty.[1]

Applying these principles to the case before us, it becomes apparent that the plaintiff and his injury were within the scope of Tonri's duty not to create a foreseeable risk of danger. The risk which Tonri created by washing the gasoline mixture down the drain was that the gasoline would catch fire and burn someone in the vicinity. Torres' warning to Tonri vividly portrays this. "But suppose somebody comes in here and drops a cigarette or match and the place goes on fire? I'll burn myself in here. And the coveralls will burn." Tropea, the plaintiff, was nearby; he was working only a few yards from the wash bay, and, in fact, he was burned by a fire caused by Tonri's washing the gasoline mixture down the drain. Therefore, the injury the plaintiff suffered was within the risk which the defendant's employee had a duty not to create. It is immaterial that the fire was ignited by the striking of a spark instead of in some other way, as by the dropping of a match.[2] It is likewise immaterial that Maripet's employee could not foresee the exact manner in which the dumping of the waste liquid would cause a fire, namely, by the creation of gaseous inflammable fumes in the grease pit.

An illustration in the Restatement of Torts serves well to explain liability in the present case:

"A is driving a car down the street. He drives so carelessly that he collides with another car. The second car contains dynamite. A is ignorant of this and there is nothing

---

1. Many courts have referred to the problems we have outlined in this paragraph as problems of "proximate cause." We have preferred to treat them as problems to be resolved in relation to the scope of the defendant's duty not to act negligently, because we believe this analysis more accurately reflects the determinants of decision. Cf. Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928); Sinram v. Pennsylvania R.R., 61 F.2d 767 (2 Cir. 1932); Ross v. Hartman, 78 U.S.App.D.C. 217, 139 F.2d 14, 158 A.L.R. 1370 (1943).

2. Only brief comment is necessary to dismiss the contention that, since the plaintiff himself created the spark which started the fire, this action on his part operated as an intervening force that terminated the defendant's liability. The fact that the plaintiff took an active step which precipitated his injury did not relieve the defendant of liability if that step by the plaintiff could have been foreseen, in a general way, by a reasonable person in Tonri's situation. Inasmuch as sparks are not uncommon in the repairing of automobiles, the occurrence that took place here was foreseeable, was a part of the foreseeable risk of danger, and accordingly did not cut off the liability of the defendant. See 2 Harper & James, op. cit. supra at 1145; cf. Serviss v. Cloud, 121 Kan. 251, 246 P. 509 (1926); Greenwood v. Jack, 175 Minn. 216, 220 N.W. 565 (1928); Judy v. Doyle, 130 Va. 392, 108 S.E. 6 (1921).

in its appearance or in the circumstances to give him reason to suspect it. The collision causes an explosion which * * * harms C who is walking on the sidewalk near the point where the collision occurs. * * * A is negligent toward C since he should have realized that careless driving might result in an accident which would affect the safety of those traveling upon the sidewalk, and the fact that the harm occurred in a different manner than that which might have been expected does not prevent his negligence from being in law the cause of the injury." 2 Restatement, Torts § 281 Ill. 1 (1934).

Cf. Johnson v. Kosmos Portland Cement Co., 64 F.2d 193 (6 Cir. 1933); Prosser, Torts § 49 (1941). The plaintiff's evidence was sufficient to require that the issue of defendant's failure to exercise due care toward the plaintiff be submitted to the jury.

■ Maripet asserts further that the plaintiff is barred from recovery because of his own contributory negligence. The general rule in New York is clear-cut and well-established:

"A plaintiff who negligently subjects himself or his property to a risk of harm from a defendant's negligence may not recover for injury resulting therefrom, except as the doctrine of last clear chance is applicable." Storr v. New York Cent. R. Co., 261 N.Y. 348, 351, 185 N.E. 407, 408 (1933).

The defendant Maripet cites us several cases in which the general rule as to contributory negligence is expounded and elaborated upon: Halpern v. United States, 129 F.Supp. 326 (E.D.N.Y.1955); Davenport v. Ruckman, 37 N.Y. 568 (1868); Whalen v. Citizens' Gas Light Co., 151 N.Y. 70, 45 N.E. 363 (1896); Avery v. New York, O. & W. R. R., 205 N.Y. 502, 99 N.E. 86, 42 L.R.A.,N.S, 158 (1912); Castle v. Director-General of Railroads, 232 N.Y. 430, 134 N.E. 334 (1922); Schrader v. New York, C. & St.

L. R. R., 254 N.Y. 148, 172 N.E. 272 (1930); Crough v. New York Central R. R., 260 N.Y. 227, 183 N.E. 372 (1932); Wadsworth v. Delaware, L. & W. R. R., 296 N.Y. 206, 71 N.E.2d 868 (1947); Utica Mutual Ins. Co. v. Amsterdam Color Works, 284 App.Div. 376, 131 N.Y.S.2d 782 (1954), aff'd, 308 N.Y. 816, 125 N.E.2d 871 (1955); Fredendall v. Abraham & Straus, Inc., 279 N.Y. 146, 18 N.E.2d 11 (1938) (per curiam); Burnstein v. Haas, 272 App.Div. 1051, 75 N.Y.S.2d 293 (1947), aff'd, 298 N.Y. 596, 81 N.E.2d 328 (1948); Maillard v. Violette, Sup., 141 N.Y.S.2d 8 (1955); Townes v. Park Motor Sales, Inc., 7 A.D. 2d 109, 180 N.Y.S.2d 553 (1938), aff'd, 7 N.Y.2d 767, 194 N.Y.S.2d 37, 163 N.E. 2d 142 (1959). But, like the cases cited on the question of the defendant's negligence, since they do not present closely analogous fact patterns, they are of little aid to us in determining the weight of evidence sufficient to support the jury's finding in the present case.

■ Maripet asserts that Tropea was contributorily negligent in two respects. First, it claims that the plaintiff should have smelled gasoline fumes when he entered the grease pit to work under the automobile. Tropea testified that he did not smell any fumes. The jury had a right to believe his testimony. Cf. Shea v. Judson, 283 N.Y. 393, 396–397, 28 N.E.2d 885, 887 (1940). He could have been preoccupied with his work. The odor of gasoline could have been masked by the other odors prevalent in the work area of a service station. Moreover, the density of the gasoline fumes might not have been strong enough to be smelled until just before the plaintiff struck the igniting spark. The jury's verdict on this point was supported by sufficient evidence.

■ Second, Maripet maintains that Tropea, as manager of the station, had a duty (owing to himself as well as to others) to know how the waste water was being disposed of. Maripet was doing the maintenance work as an independent contractor, and it was not Trop-

ea's function as manager of the station to oversee Tonri's work or otherwise to inquire into the methods he was using for disposing of the fluid pumped from the tanks. If Tropea had seen Tonri washing the mixture down the drain, perhaps he would have been obligated as the manager of the station to require Tonri to desist. But Tropea testified that he gave no directions concerning the disposal of the fluid and that he did not know how Tonri was disposing of it. Without such knowledge on his part, the fact that Tropea was manager of the station is not significant to the resolution of this issue. Although Tropea's profession of ignorance may be somewhat difficult for us to believe, it is far from incredible. There was evidence that his work took him away from the vicinity of the wash bay for most, if not all, of the time Tonri was there. Therefore, we cannot hold that the jury was unreasonable in accepting the plaintiff's testimony. As there was substantial evidence that it was the custom of the trade to carry off the liquid obtained from the tanks in trucks and that such had always been the procedure at Tropea's station, Tropea could not have foreseen that the waste water would be dumped down the station's wash bay drain.

Maripet attempts to support its contention of contributory negligence by claiming that Tropea knew that there was no drum on Tonri's truck into which the maintenance man could put the waste. Actually, Tropea only testified that he did not see such a drum, and that he did not notice what equipment was on the truck. Since there was no evidence that the absence of a drum was brought home to Tropea, the jury could rightly assume that Tropea's observation of the truck was quite cursory. It would be unreasonable to hold him responsible for failing to appreciate the danger which lurked behind this casual observation. The jury's decision that the plaintiff was free from contributory negligence was supported by the evidence.

We now turn to the appellant Maripet's claims that if it is not entitled to judgment it is at least entitled to a new trial because of prejudicial trial errors. It contends that the judge's charge to the jury on the question of contributory negligence was erroneous in two respects. First, the trial court refused to give the following charge requested by Maripet:

"The duty of the plaintiff to exercise reasonable care for his own safety under all the circumstances is to be judged by you by the application of the same standard which you are to apply in judging the question of any negligence on the part of the defendants."

It was not erroneous for the court below not to give this requested charge. He did charge:

"The plaintiff must not only prove negligence and proximate cause, but the burden is also upon him to prove by a preponderance of the evidence that he himself was free from negligence; that is to say, that this accident was not brought about by any fault of his own."

There was no indication that the term "negligence" in the judge's charge as it related to the plaintiff's conduct had any different meaning from the same term as it related to the conduct of Maripet's employee. We should not assume that the jury applied a different standard to the plaintiff's conduct from that which it applied to the conduct of the defendant's employee. The requested charge added nothing to the charge given.

Second, Maripet claims that the trial court should have also charged the following:

"This accident happened while plaintiff was working in the confined area of a pit in a gasoline station of which plaintiff was the manager. He was required to take into consideration any and all hazards incident upon the work he was doing in the area in which it was being performed in the light of all attendant circumstances, either actually known to him or of which you may

find he should have had knowledge as the manager of the gasoline station."

Instead, the judge charged:

"You will recall that the Court did tell you that the plaintiff had not only the burden of proving the negligence of these two defendants, but that he, himself, was free of negligence and that if he contributed to this injury in any way, or the explosion, he could not recover.

"Now, you will keep in mind also that the plaintiff in going about his work there at the filling station assumed the ordinary hazards of his work. That doesn't mean that he assumed the hazards from someone else's negligent acts, but the ordinary hazards of the work around the filling station, of course, of his, are his to assume, and that he did so. And I just thought of probably one other explanation that in that regard might be important, so that you will be sure not to be confused in that regard."

The judge below was correct in not giving the requested charge. The law did not require the plaintiff to consider "any and all hazards incident upon the work he was doing"; it only required him not to expose himself to any unreasonable risk of harm. Perhaps the judge should not have added to his charge that Tropea did not "assume the hazards from someone else's negligent acts." But this was not reversible error because Maripet's objection to the charge, when it was given, did not distinctly apprise the trial judge, as was required by Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C. A., cf., New York, N. H. & H. R. R. v. Zermani, 200 F.2d 240 (1 Cir. 1952), cert. denied, 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351 (1953), in what way this part of his charge might have been erroneous. No other criticism of the charge is worthy of discussion.

█ Maripet also seeks reversal because of several references by the plaintiff's counsel before the jury to the fact that the plaintiff had children. The general rule in the federal courts is that a reference to the dependent children of the plaintiff merely for inducing sympathy from the jury and without legitimate bearing on a genuine issue in the case is inadmissible. Pennsylvania Co. v. Roy, 102 U.S. 451, 26 L.Ed. 141 (1881); Slattery v. Marra Bros., 186 F.2d 134 (2 Cir.), cert. denied, 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1351 (1951); Chesapeake & O. Ry. v. Stojanowski, 191 F. 720 (2 Cir. 1911). But if the reference is only a chance remark of counsel in argument or if it is the voluntary remark of a witness, appellate courts will hesitate to reverse for such an impropriety. See Chicago & N. W. Ry. v. Kelly, 74 F.2d 31 (8 Cir. 1934) (dictum). And, of course, if no objection is made to the remark, reversal will rarely follow. See Slattery v. Marra Bros., supra; New York Elec. Equipment Co. v. Blair, 79 F. 896 (2 Cir. 1897).

██ We have studied the record in the present case at the points where reference was made to the children of the plaintiff. Several of these statements and questions bore on the relevant question of the psychic state of the plaintiff before and after the accident, a matter the plaintiff sought to establish through lay and medical testimony. At another point, a reference to children was objected to and the objection was sustained. The court ruled that the remaining references were "innocuous, and certainly not intended in any sense of the word to inject an improper element into the lawsuit." When an interjection at trial can serve both legitimate and illegitimate purposes, the trial judge must be given some latitude in setting the bounds of propriety. We do not wish, by what we say, to encourage plaintiffs' lawyers to flirt with reversal in this respect during the trial of future cases. But as there was a legitimate purpose for some of the references to children during this trial, as the trial judge explicitly found that the other references were innocent ones in purpose and effect, and as no question of loss of earning power was

involved in this case, compare Pennsylvania Co. v. Roy, supra, and Lacorazza v. Cantalupo, 210 F. 875 (2 Cir. 1914), we will not reverse and order a new trial on this ground. Cf. Chesapeake & O. Ry. v. Stojanowski, 198 F. 77 (2 Cir. 1912) (dictum).

■ Lastly, Maripet seeks a new trial on the ground that the verdict of $35,000 was excessive and that the jury in arriving at this figure must have been influenced by the references to plaintiff's children. Tropea suffered severe first, second, and third degree burns on both hands, a leg, the face, and the hairline. Skin hung down six or seven inches from his hands and had to be cut off. These injuries confined him in the hospital for thirty-six days immediately following the accident. His doctor first performed a debridement, the surgical removal of the contaminated tissue. Next, for four or five days, compression bandages were applied to the burned parts. Then these areas were left exposed to room temperature. He received drugs and antibiotic therapy to prevent infection. For the first two weeks he was in constant pain, which gradually lessened thereafter, and for three or four weeks movement of the burned areas was restricted. After being discharged from the hospital, the plaintiff returned periodically for physical therapy treatments and routine check-ups.

On May 27, 1959, the plaintiff reentered the hospital for a stay of two days. He was emotionally disturbed, quite tense and upset. He had marked trembling and shaking, nausea and vomiting, headaches, paresthesia and nervousness. There were no discoverable abnormalities, but the slightest thing would cause him to become excited. The plaintiff's doctor testified that these emotional problems could have been a result of post-injury trauma.

The plaintiff was again admitted to the hospital for three or four days in January, 1961. He suffered cosmetic deformities on both hands and one leg, and he had a postburn psychic disturbance.

Both the cosmetic deformities and the psychic disturbance were then considered to be permanent. He experienced no functional body defect, but the burned areas of his body were more sensitive to cold and more susceptible to trauma and to dermatitis.

A week before trial plaintiff was examined medically, and this examination revealed that his head, face, chin, and lip area were red and that there was atrophic scarring on his face, that is, a diminishing of the skin markings and furrows found on a normal person. There was also a loss of pore formation, and the skin hung rather loosely from the underlying tissue. Scarring and redness were likewise present on Tropea's hands, wrists, elbows and knees.

The plaintiff's buttocks were scarred and discolored. The burns on his buttocks caused Tropea to have a constant itching sensation, especially when he sat down. Also, his right leg itched persistently.

Under the standard announced in Dagnello v. Long Island R. R., 2 Cir., 289 F. 2d 797, 806 (1961), we do not consider the verdict of $35,000 to have been so excessive, even though it may have been generous, as to require us to remand for a new trial or to suggest a remittitur.

Accordingly the judgment against Maripet is affirmed.

■ The final question we need to consider is whether liability for the negligence of Maripet's employee attaches to Shell. The jury found Shell liable in negligence to the plaintiff. After verdict the trial judge granted Shell's motion for judgment on its cross-claim against Maripet. This was granted on the ground that Maripet's contract with Shell required Maripet to indemnify Shell for any loss Shell might suffer from any negligent performance by Maripet of its contractual arrangements with Shell. It was undisputed that Shell hired Maripet as an independent contractor. The general rule in New York, as elsewhere, is that one who hires an

independent contractor is not liable for the negligent acts of the independent contractor or its employees. Boylhart v. Di Marco & Reimann, Inc., 270 N.Y. 217, 200 N.E. 793 (1936); 2 Restatement, Torts § 409 (1934); Dalton v. Angus & Co., 6 A.C. 740, 829 (1881). However, there are exceptions to this rule. The principal exceptions in New York are set forth in May v. 11½ East 49th Street Co., 269 App.Div. 180, 54 N.Y.S. 2d 860 (1945), aff'd per curiam, 296 N.Y. 599, 68 N.E.2d 881 (1946):

> "The general rule, that an employer of an independent contractor is not liable for the negligence of the latter's servants, is subject to certain well-recognized exceptions, the principal ones being that such liability persists: (1) where the employer of the contractor is under a statutory duty to perform or guard the work, or (2) has assumed a contractual obligation to perform it, or is under a duty to keep the premises safe, or (3) where readily foreseeable danger is inherent in or created by the work assigned to the contractor." 54 N.Y.S.2d at 862.

■ Shell leased the premises involved here to the plaintiff's employer with a right in Shell to inspect and repair the equipment. However, there was apparently no contractual obligation owed by Shell to Aeroflex to make these repairs. In New York, in the absence of some exception to the general rule, a lessor who owes no duty to its lessee to make repairs is not liable for the negligence of an independent contractor hired by the lessor to make such repairs. May v. 11½ East 49th Street, supra; Keating v. Blake, 263 App.Div. 898, 32 N.Y.S. 2d 561 (1942); but cf. 2 Restatement, Torts § 420 (1934).

■ The only other relevant exception to the general rule that one who hires an independent contractor is not liable for the latter's negligence is the exception for "inherently dangerous activities." The term is not subject to a precise definition. Compare 2 Restatement, Torts § 427, comment a with Harper & James, Torts § 26.11 at n. 56 (1956). It includes some activities not commonly classified as "extrahazardous." On the other hand, a mere showing that precautions must be taken to avoid a dangerous condition is insufficient to classify an activity as inherently dangerous. Id. at 1408–1409. The cases in New York portray an ambiguous and probably irrational classification: Making an excavation has been deemed inherently dangerous. Storrs v. City of Utica, 17 N.Y. 104, 72 Am.Dec. 437 (1858); Murphy v. Perlstein, 73 App.Div. 256, 76 N.Y.S. 657 (1902). Raising an unguarded embankment in a highway has likewise been so classified. Deming v. Terminal Ry., 169 N.Y. 1, 61 N.E. 983 (1901). Leaving a pile of metal rails or beams in the street is in this category. Ramsey v. National Contracting Co., 49 App.Div. 11, 63 N.Y.S. 286 (1900); Boylhart v. Di Marco & Reimann, Inc., supra. So, too, removing or roping off parts of the sidewalk. Mullins v. Siegel-Cooper Co., 95 App.Div. 234, 88 N.Y.S. 737 (1904), aff'd 183 N.Y. 129, 75 N.E. 1112 (1905); Langevin v. Schaller, 163 App. Div. 52, 148 N.Y.S. 534 (1914). Also, leaving a chute open in a public way. Downey v. Low, 22 App.Div. 460, 48 N. Y.S. 207 (1897). Demolishing a building. Hanley v. Central Sav. Bank, 255 App.Div. 542, 8 N.Y.S.2d 371 (1938) (alternative holding), aff'd per curiam, 280 N.Y. 734, 21 N.E.2d 513 (1939). Using scaffolding over a public sidewalk. Rohlfs v. Weil, 271 N.Y. 444, 3 N.E.2d 588 (1936). And soaping mats on a public sidewalk. Wright v. Tudor City Twelfth Unit, Inc., 276 N.Y. 303, 12 N.E.2d 307, 115 A.L.R. 962 (1938).

On the other hand, installing new flooring has not been classified as inherently dangerous. Parsan v. Johnson, 208 N.Y. 337, 101 N.E. 879 (1913). Nor has cutting into a party wall been so classified. Keller v. Abrahams, 13 Daly 188 (1885). Likewise, installing a sign over a public way. McNulty v. Ludwig & Co.,

125 App.Div. 291, 109 N.Y.S. 703 (1908). So, too, leaving an open register in the floor while repairing a heating system. Weinfeld v. Kaplan, 282 N.Y. 348, 26 N. E.2d 287 (1940). Also, reconditioning a building. Miller v. Home Owners' Loan Corp., 263 App.Div. 607, 33 N.Y.S.2d 985 (1943). And filling an oil tank. English v. Merroads Realty Corp., 288 N.Y. 93, 41 N.E.2d 472 (1942) (per curiam).[3]

We conclude that cleaning fuel tanks is not an inherently dangerous activity.[4] It was only made dangerous by the particular way in which Tonri disposed of the waste liquid. Other methods of disposal would not have created this risk. This type of work is more like those occupations involved in the New York precedents which held that no inherent danger was present than the precedents which held the other way. Especially similar to the present type of work was the occupation involved in English v. Merroads Realty Corp., supra. The occupation there was that of filling an oil tank. The employee of an independent contractor spilled some oil which spread to an oil burner and ignited. The court in that case held that no inherent danger was involved.

It should be added that there is no reason to assume that Shell should have foreseen the method which Tonri would employ to dispose of the fluid which he pumped from the fuel tanks.

The judgment against Shell is reversed and, hence, the judgment over in its favor is vacated, and the cause is remanded with instructions to dismiss the plaintiff's complaint as to Shell.

As stated above, the judgment against Maripet is affirmed.

LUMBARD, Chief Judge (dissenting).

While I agree with Judge Waterman's conclusions on the points he discusses, I would reverse the judgment and grant a new trial as to Maripet because of the repeated interjection by plaintiff's counsel of prejudicial references to the plaintiff's children. These references were persisted in even after the law in this circuit had been cited and despite the admonition of the distinguished visiting judge who presided at the trial. In a case where the issues of negligence and contributory negligence were so doubtful, and the damages awarded were so generous, we should not disregard the probable adverse effect of such flagrant tactics as this record discloses.

The law in this circuit is well settled that in damage suits references to the plaintiff's children are irrelevant, Slattery v. Marra Bros., Inc., 186 F.2d 134 (2 Cir. 1951) and cases cited in footnote 4, page 137. Where suitable objection has been made such error by itself is enough to require reversal, as Judge Learned Hand pointed out in the Slattery opinion.

The record here is eloquent testimony to the repeated play of counsel upon the forbidden subject of the plaintiff's offspring. In his opening statement to the jury counsel said that he would prove that the burns had "affected his ability to do the every day things that any human being wants to do, including the ability to loiter with and play with his children." Defense counsel interrupted to object. The trial judge made no ruling and merely told counsel to proceed. When the plaintiff took the stand his counsel asked him how many children he had. Objection by the defense was sustained by the judge and counsel withdrew the ques-

---

3. It would appear that most of the cases in which inherently dangerous activity was found involved hazards to a public thoroughfare, and most of the cases in which no such hazard was found involved private premises. Cf. Harper & James, op. cit. supra at 1409. Why this difference should be significant is difficult to understand.

4. In some cases it has apparently been a question for the jury whether the occupation at issue was inherently dangerous. E. g., Wright v. Tudor City Twelfth Unit, Inc., supra. In other cases the occupation has been such that the court could make the determination. E. g., Weinfeld v. Kaplan, supra. We see no reason why this court in this case cannot make the decision.

tion stating that he did not concede that the objection was well taken. A little later counsel again referred to plaintiff's family:

"Q. And you came back to the United States, and you married and raised a family? A. Yes."

A little later further reference to the subject was prompted by counsel's questions:

"Q. You went back to work in three months, didn't you? A. Oh, I had to.

"Q. What do you mean, you had to? A. Well, my wife had just given birth on that day, and I was very anxious to get back.

"Q. You mean because your wife gave birth—"

At this point there was an interruption and the subject was changed for a moment but counsel returned to it by asking:

"Q. Did you ever have any trouble getting along with your wife and your children? A. No."

After two more questions the jury was excused for the day and after they had retired defense counsel moved for a mistrial citing the above references to the children. The trial judge overruled the motion stating that the references seemed innocuous and "not intended to inject an objectionable fact." Defense counsel again referred to the Slattery case which had previously been cited.

The next day plaintiff's counsel was on the point of referring to the children in the direct examination of another witness when timely interruption from defense counsel and admonition from the court succeeded in persuading plaintiff's counsel that he should not risk a motion for a mistrial.

When the plaintiff's wife took the stand after the luncheon recess, counsel's third question was "And how many children do you have?" Objection to the question was sustained by the court, but the very next question referred to the plaintiff supporting the witness "and your family."

At the end of the proof, the judge inquired whether counsel wished the court to comment in the charge to the jury regarding references to the children. Defense counsel asked the court to make "very brief reference to it by simply saying that the question of whether the plaintiff has children or the number of children has nothing to do with either his right or recovery or the amount of his damages." Plaintiff's counsel then assured the court he would make no comment about the children: "I feel that if I tell your Honor now that in view of that, I'll make no comment about it in my summation, I don't think that your Honor has to make any statement about it to the jury."

Despite his assurance, plaintiff's counsel at the conclusion of his argument for damages for pain and suffering did make such reference, saying:

"Do you think he'll ever be able to live as happily with a devoted wife and children in the future as he did before? Is that pain? Is that suffering?"

Despite this deliberate breach of the court's injunction by plaintiff's counsel, the judge made no comment in his charge to the jury. As the judge failed to make some attempt to restore the balance, there was nothing defense counsel could do to repair the damage. Had further admonition come as a part of the judge's charge it would have carried some weight; as a supplemental instruction, on further prodding by counsel, it would have served only to emphasize what should not have been mentioned and what should not have been repeated.

On this record I can only conclude that an improper issue was deliberately and repeatedly injected into the case by plaintiff's counsel as a calculated risk. I also conclude, reluctantly, that the trial judge failed to protect the defendants as he was required to do by the controlling cases in this circuit. We have recently reversed a jury verdict because matter prejudicial to a plaintiff was not excluded by the trial judge, St. Clair v. East-

ern Air Lines, Inc., 279 F.2d 119 (2 Cir. 1960), and we have recently reversed convictions in two criminal cases because of improper and prejudicial summations by government counsel, United States v. Persico, 305 F.2d 534 (2 Cir. 1962); United States v. Bugros, 304 F.2d 177 (2 Cir. 1962). There is every reason why we should similarly protect defendants in damage actions, even though this requires a reversal of the judgment and a new trial.

I would reverse the judgment as to both defendants, granting a new trial against Maripet, and directing dismissal of the complaint against Shell.