### NORFOLK & W. RY. CO. v. COLLINGSWORTH.

Circuit Court of Appeals, Sixth Circuit. May 10, 1929.

No. 5152.

562

James I. Boulger, of Columbus, Ohio, and Henry Bannon, of Portsmouth, Ohio, for appellant.

R. B. Newcomb, of Cleveland, Ohio (Newcomb, Newcomb & Nord, of Cleveland, Ohio, and Pugh & Pugh, of Columbus, Ohio, on the brief), for appellee.

Before MOORMAN, MACK, and HICKS, Circuit Judges.

HICKS, Circuit Judge. Collingsworth, a switch oiler, while engaged as such, at about 7:30 p. m., October 15, 1926, in the yards of appellant, was run down and injured by the front of a cut of 11 or 12 box cars being shoved by an engine moving backwardly. He brought this suit to recover for the damages inflicted. Appellant's motion for a directed verdict was denied and the court, clarifying the averments of the petition, submitted the case to the jury upon two allegations of negligence: First, that "the train was moving eastwardly without having a watchman or lookout on the leading car, and without maintaining a light on the forward end of the train, and without giving any warning signal or notice of the train's approach"; and, second, "that the crew by the exercise of ordinary care should have known of the presence of the plaintiff on the track and thus avoided the accident."

We believe the motion for a directed verdict should have been sustained. The suit was brought under and falls within the Federal Employers' Liability Act (Act April 22, 1908, c. 149, § 1, 35 Stat.; title 45, c. 2, § 51, U. S. C. [45 USCA § 51]). This act permits a recovery only upon proof of negligence, and we believe that there was no evidence of any lack of due care upon the part of appellant touching any duty it owed to appellee. Appellee's duty was to oil 28 switches. He oiled each switch about three times daily. The accident occurred at the switch located farthest west in the yards. This switch was at the junction of the westbound main line track and a lead switch track extending eastwardly and parallel with the west-bound main. Other switch tracks branched from the lead switch track and extended eastwardly. The greater part of the switch yard was therefore toward the east. At the point of the accident there were four parallel tracks running east and west. They included the east and west bound main tracks and the lead switch track and one other switch track.

The accident occurred about halfway between a viaduct on the west and a temporary trestle on the east. This viaduct and trestle were parallel with each other and crossed the railroad tracks at right angles and were about 300 feet apart. The trestle was about 50 feet high. At a point about 300 feet east of the switch where appellee was injured, and about 75 or 100 feet east of the trestle, there were flood lights about 25 feet higher than the trestle, fixed on the cross-arms of a pole or tower. These lights were equipped with reflectors. The purpose of the flood lights was, of course, to light the yards; but the intervening trestle cast a shadow upon the switch where appellee was injured, and

upon the greater part, if not all, of that portion of the yards between the viaduct and the trestle. However, there were three arc lights upon the viaduct. The weather was clear, but on account of the shadow it was, of course, darker at the point of the accident than elsewhere at that hour. A switch engine pulling 11 or 12 box cars approached from the east on the east-bound main track and pulled in on a cross-over toward the west-bound main. Moore, a brakeman, left the cars while on the cross-over, saw and talked to appellee about 100 to 150 feet east of the switch, left appellee there, got on the engine as it moved west, got off at the switch, and after the cars had passed threw the switch for the west-bound main, thus displaying a green light, indicating that the switch was left open for a return of the cars along the west-bound main. The purpose was to take these cars to a point in what was called the "flat yards," where they were to be put into a west-bound train. After the engine and cars had passed on toward the west and through the viaduct, appellee came to the switch and proceeded to oil it. He had a bucket of oil and a brush about 2 or 2½ feet long. He stood between the rails and smeared oil along the side of the rails. He had been unfortunate, in that he had previously suffered the loss of one eye. He had no lantern. While he was thus engaged, the cut of cars pushed by the engine backed eastwardly along the west-bound main. The front car struck appellee on the shoulder, knocked him down, and ran over and seriously injured him. The accident was not seen by any of the train crew.

The uncontroverted evidence is that during such a switching operation the post of duty of the front brakeman is upon the top and about the center of the front box car. The center of the car is chosen rather than the front, to lessen the danger of being thrown off in the event of any sudden jerk or movement of the train. He is equipped with a lantern burning a white light and used as a signal to control the train movement. The brakeman's lantern is not used as a warning to employees upon the track and the brakeman is not charged with any such duty toward such employees. Moore testified: "I have a lantern to give signals with, and know of no other purpose for them."

Just where Moore was located on the cars at the time of the accident is not entirely clear. The weight of the evidence is that he was at the usual place, to wit, about the center of the top of the first car. Appellee ad-

mits that he knew his position was dangerous. It was particularly dangerous, in that it was at a switch on the main line. He admits that it was his duty to watch for the trains and to look out for himself; that he knew that the west-bound main track was used in making up and shifting cars in the yard, and that the crew of the train that injured him was a yard crew, and that the cut of cars was ahead of the engine; that he knew that the crew was working in the yards that night, and that this crew was not running any main-line trains. He, of course, also knew that this crew with the engine and cars was out on the main line, and must necessarily return to a side track either over the switch at which he was working or at some other point. He had oiled these 28 switches, including the particular one at which he was injured, daily, since May 17th, working from 2 p. m. until 10 p. m. We conclude, therefore, that the case falls within Toledo, St. L. & W. R. Co. v. Allen, 276 U. S. 165, 171, 48 S. Ct. 215, 72 L. Ed. 513, 516; Chesapeake & Ohio R. Co. v. Annie Nixon, 271 U. S. 218, 219, 46 S. Ct. 495, 70 L. Ed. 914, 915; Boldt v. Pa. R. Co., 245 U. S. 441, 38 S. Ct. 139, 62 L. Ed. 385; Pa. R. R. Co. v. Lutton, 29 F.(2d) 689, 690 (C. C. A. 6); Connelley v. Pa. R. Co., 201 F. 54, 56 (C. C. A. 3), 47 L. R. A. (N. S.) 867; Gilmer v. Yazoo & M. V. R. Co., 4 F.(2d) 963, 964 (C. C. A. 5).

Under these conditions the proof fails to warrant a finding of negligence against the appellant. It had a right to assume that appellee would look out for himself. The risk was hazardous, but it was, after all, only that ordinarily and normally incident to his job. If the shadow cast by the trestle created an extra hazard, appellee was well aware of it. He assumed not only the ordinary risks of his employment but all extraordinary risks which were obvious or fully known and appreciated. Delaware, L. & W. R. Co. v. Koske, 49 S. Ct. 202, 73 L. Ed. — (decided February 18, 1929); Gulf, C. & S. F. R. Co. v. Jackson, 65 F. 48, 51 (C. C. A. 8).

Moore owed no duty to appellee. The lantern was not intended for appellee's protection. It is, therefore, not material to determine just the exact location of Moore upon the train. Norfolk & W. R. Co. v. Gesswine, 144 F. 56, 59 (C. C. A. 6).

However, appellee insists that one feature of the case presents an exception to the assumption of risk principle—that the verdict is supported by evidence that appellant had established a custom to place a warning lantern upon the upper head end of the lead-

ing box car while cars were engaged in backing movements; that this custom was for the benefit of employees upon the track, and that upon the occasion of his injury the custom was violated. The evidence relied upon to support such finding is found in the testimony of appellee himself, to wit: "When the cars were backing up the light would be on the rear end nearest to me; if a box car, up on the end nearest to me. The light was a bright white lantern light. I was looking for that sort of light this night, and there was none. The illustration shown on page 156 of Exhibit I shows the position of the lantern standing on the top on other occasions when trains approached me while I was working, and before I was hurt there was always a bright light at the upward end of a box car as a warning to me, and I would get out of the way."

In our view this evidence, when considered along with certain other evidence introduced by appellee, is too insubstantial and unconvincing to support a jury verdict. It amounts at best to no more than a "scintilla of proof." Hardy-Burlingham Min. Co. v. Baker, 10 F.(2d) 277, 279 (C. C. A. 6); Small v. Lamborn & Co., 267 U. S. 248, 254, 45 S. Ct. 300, 69 L. Ed. 597, 600. The phrase "as a warning to me" is nothing more than assumption. The effect of this evidence as tending to establish a custom is weakened, if not entirely destroyed, by other testimony introduced by appellee.

Walter Collingsworth, another switch oiler in appellant's yards, appellee's brother and his witness, testified that the lights he (Walter) would see were the lights from the brakemen's lantern, which they would hold in their hands. Fields, another switch oiler, in response to the question, "Tell the jury what, if any, warning you had from the cars that came along there when you worked there, * * *" answered, "I just simply had to watch them myself."

It is also in evidence that the following rule, styled rule 24, was in force, to wit: "When cars are pushed by an engine, *except when shifting or making up trains in the yard*, a white light must be displayed on the front end of the leading car by night." (Italics ours.) Appellee was acquainted with this rule, and it gave him notice that he need not expect warning lights upon trains engaged in switching operations, for such were expressly excepted from the rule. Whatever character of light appellee may have seen or thought he saw upon the cars upon previous occasions, the fact remains that there is no evidence indicating that appellant ever knew of, adopted, or assented to the practice of placing lighted lanterns upon the top and front of cars while being switched, or that the crew of this particular train were ever directed to practice such a custom. See Howard v. New York, New H. & H. R. Co., 236 Mass. 370, 128 N. E. 422.

For the reasons indicated, the judgment of the lower court is reversed, and the cause remanded for a new trial.

█ This action renders inconsequential errors assigned upon the general charge of the court and upon his refusal to charge certain requests. Nor is it important now to determine whether there was error in allowing the appellee to introduce rule 24. It is perhaps sufficient to say that the introduction of this rule was not prejudicial. It was indeed favorable to appellant's insistence, because it excepted switch trains, such as inflicted the injury upon appellee, from the rule requiring a warning light on certain character of trains.