**SINRAM et al. v. PENNSYLVANIA R. CO.**
**(INSURANCE CO. OF NORTH AMER-**
**ICA, Intervener).**

**No. 67.**

Circuit Court of Appeals, Second Circuit.

Nov. 14, 1932.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New

York City, of counsel), for Pennsylvania R. Co.

Single & Single, of New York City (Thomas H. Middleton, of New York City, of counsel), for Insurance Co. of North America.

Park, Lynch & Hagen, of New York City (Anthony V. Lynch, Jr., and Charles W. Hagen, both of New York City, of counsel), for Sinram Bros.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

Sinram Brothers filed a libel in personam against the respondent for the sinking of their barge after a collision, while in tow of one of the respondent's tugs. The Insurance Company of North America was the underwriter of, and had paid the loss upon, a cargo of coal laden on the barge after her injury; it intervened in the suit pro interesse suo. We shall speak of the Sinram Brothers as the owner, and of the insurance company as the underwriter.

On January 28, 1928, the railroad's tug, Overbrook, picked up the owner's barge, Elmhurst, then light, in the East River and towed her to the end of Pier B, Jersey City, preparatory to taking her to South Amboy in a flotilla for a cargo of coal. At nine p. m. the tug, having gathered five other light barges, took them with the Elmhurst in tow, made up in two tiers of three each; the Elmhurst being the port barge in the second tier. At the stern of the middle barge in that tier hung the Mercer, another of the railroad's tugs. The story of the Elmhurst's bargee was that off Bedloe's Island a third tug of the railroad, the No. 35, the largest in its service, came alongside, struck the barge a heavy blow on her port quarter, nearly capsizing her, driving her forward against the barge ahead, and breaking some planks forward. The tug then made fast on her port quarter, lapping her some six to ten feet, and hanging on until the flotilla reached Snug Harbor, when she cast off and disappeared. There was a stiff northeast breeze at the time, which raised a sea; it was snowing hard and the weather was cold. While lying alongside, the No. 35 constantly chafed and hammered the barge, which, coupled with the original collision, started some planks at her stern. When the flotilla reached South Amboy, the bargee tried to learn whether his barge had been damaged, but her outside was covered with ice and he could find nothing. He had got there on the morning of the twenty-ninth, and lay light at the stakes till February second, when he was shifted to the chutes and took aboard four hundred and fifty-four tons of the underwriter's coal. Late on the evening of the third, or early on the morning of the fourth, he discovered her aleak and asked another tug of the respondent, the No. 33, to put her on the flats. Some hours later the tug came and did as he asked; apparently he was satisfied that she was safe, but soon after she sank.

The railroad's story was that the No. 35 came alongside the barge to put a deck hand aboard, made fast, and lay lapping the barge for a short time, but upon the protest of the bargee soon fell back, and took the Mercer's position at the tail of the middle barge in the second tier, where she remained till the flotilla reached Port Reading, when she dropped off. After the barge was raised, a survey discovered the damages as described, though how far caused by the collision, and how far due to the sinking, does not yet appear. The boat was very old and either her caulking in places had been reinforced by strands of rope, or she had been caulked with the rope itself. While the respondent for this and other reasons asserted that she was unseaworthy, the evidence was so much in conflict that we accept the finding that she was not. The judge believed the libellant's story in substance, both as to the original collision and the continued presence of the No. 35 alongside; also as to his excuse for not learning of the injuries and protesting against being loaded. He allowed full damages to both the owner and the underwriter.

The bargee's testimony as it reads in type is extremely unsatisfactory. He insisted that the flotilla had left Jersey City early on the morning of the twenty-ninth, though this was obviously untrue; and that the No. 35 had hung alongside him down the Bay, though the evidence was abundant that the Mercer gave place to her shortly after she came alongside at Bedloe's Island. Nevertheless the testimony of the master and the deck hand of the No. 35 does not expressly contradict him as to the original collision, and concededly the tug did come alongside, lap the barge by some six to ten feet, and put a line on board her. This limited dispute is between two witnesses on one side and one on the other, and in spite of the evident untruth of some of the bargee's story, we will not interfere with the finding that the tug struck the barge and broke her planks forward and aft. So far as any of

the injuries must depend upon the alleged hammering on the way down, we find for the respondent, though the issue can scarcely prove material. We have too often declared that the District Judge's determination as to the credibility of witnesses must prevail, and while we should on this record alone decide otherwise, and do so decide as to the position of the No. 35 en route, we will not dismiss the libel.

However, we cannot agree that the respondent is liable to the owner for the sinking. It is clear that the bargee thought that his barge had been injured; he did not suggest that the collision was trifling. On the contrary he says that he tried to examine her next day at South Amboy, but was unable to do so because of the ice. This was on the twenty-ninth, four days before she was loaded. He knew that she had been struck above the water line, and he should have considered that her injuries, if there were any, might not betray themselves by leaks while she was light. It does not appear that he went below to learn what he could by looking inside, though the planks on the quarter, being started, should have showed, and the cracks in the bow went all the way through. Be that as it may, if the weather prevented him from properly examining her, he should certainly have objected to loading her until he could, for she was not safe if her seams were open. He did nothing of the sort, and gave the respondent no intimation that all was not well with her.

This is indeed a defence which the respondent must prove; it is in mitigation of damages and depends upon the injured party's duty to protect himself. The J. G. Rose, 9 F.(2d) 917 (C. C. A. 2); The Eclipse L. & T. Co. v. Cornell Steamboat Co., 242 F. 927 (C. C. A. 2); The Asbury Park, 147 F. 194 (C. C. A. 2); The Kaiser Wilhelm der Grosse, 145 F. 623 (C. C. A. 2); The Mars (D. C.) 9 F.(2d) 183. All these were cases of neglect by a bargee; they all involve as a premise that a bargee's duties include such care of his boat. It seems to us that the respondent has carried its burden, and exonerated itself from all damages to the barge after the collision.

Finally, the owner argues that the respondent was slack in protecting the barge after the bargee asked for help on the early morning of the fourth. So far as appears, the delay did no damage; he asked to be put on the mud flats, and when the No. 33 came to put him there, the barge was still afloat.

Nor can we see that the respondent was at fault in doing no more than the bargee asked. In Du Bois Sons & Co. v. P. R. R. Co., 47 F.(2d) 172 (C. C. A. 2) the bargee had not asked to be put where the tug put him; it was the tug which chose what in the circumstances was a foul berth. But here the tug might rely upon the bargee to select what he thought was a safe berth; indeed it does not appear why, once on the flats, she sank at all. We held in The B. B. No. 21, 54 F.(2d) 532, that a tug was not excused by the bargee's request to be moored in a berth which might become dangerous, if the wind changed, as it did; for bargees are not skilled mariners, or accountable for forecasting wind and weather. But we have several times charged them with responsibility for the bottom of a foul berth [The Bleakley No. 76 (C. C. A.) 54 F.(2d) 530; The Eastchester (C. C. A.) 20 F.(2d) 357; Hirsch Lumber Co. v. C. Ottaviano & Co. (C. C. A.) 18 F.(2d) 952; The W. H. Baldwin (C. C. A.) 271 F. 411]; and this case seems to us to fall within that rule, though it is not, it must be confessed, precisely on all fours. Therefore we decline to pass upon whether The White City, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699, has overruled Doherty v. P. R. R. Co., 269 F. 959 (C. C. A. 2). Indeed, while it is probable that the railroad had accepted the barge under a single contract to tow her light to the coal chutes and bring her back loaded, that did not appear. If it had, the agreement may take the case out of the usual towing contract, which was all that was involved in The White City, supra, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699.

There remains the question of the respondent's liability to the underwriter. We have assumed sub silentio that the sinking of the barge was a consequence with which the respondent would be charged, except for the bargee's subsequent fault which barred his recovery, but for which the underwriter was not responsible. We pass the question as to how far a person, guilty of some actionable wrong against another, is liable for damages which cannot be foreseen. The Polemis, [1921], 3 K. B. 560. That question we raised in The Glendola, 47 F.(2d) 206, but did not answer; nor need we now, because the underwriter was not the original victim of the collision. Rather, the situation is like that in Palsgraf v. Long Island R. R. Co., 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253, where, abstractly stated, the point was whether, if A. omitted to

perform a positive duty to B., C., who had been damaged in consequence, might invoke the breach, though otherwise A. owed him no duty; in short, whether A. was chargeable for the results to others of his breach of duty to B. The decision was by a very narrow majority, and was contrary to some of the dicta in Smith v. London & S. W. Ry. Co., L. R. 6 C. P. 14, which probably are now the law in England. Explicit discussion of the question in the books is not common, though the Supreme Court of New Hampshire in Garland v. Boston & Maine R. R., 76 N. H. 556, 86 A. 141, 46 L. R. A. (N. S.) 338, Ann. Cas. 1913E, 924, had, before Palsgraf v. Long Island R. R. Co., consciously anticipated the result. It was implicit nevertheless in several other cases. Bremer v. L. R. & W. R. R. Co., 318 Ill. 11, 148 N. E. 862, 41 A. L. R. 1345; Peterson v. R. R. Co., 143 N. C. 260, 55 S. E. 618, 8 L. R. A. (N. S.) 1240, 118 Am. St. Rep. 799; Wood v. Pa. R. R. Co., 177 Pa. 306, 35 A. 699, 35 L. R. A. 199, 55 Am. St. Rep. 728; Trinity, etc., Ry. v. Blackshear, 106 Tex. 515, 172 S. W. 544, L. R. A. 1915D, 278. Alabama, etc., Ry. v. Chapman, 80 Ala. 615, 2 So. 738, is to the contrary, but Hill v. Winsor, 118 Mass. 251, is not; for the plaintiff's presence was, or should have been, known to the defendant's tug when it struck the piling. Again, the same doctrine appears in the rulings of the Supreme Court, that the breach of a railroad's duty to one class of persons creates no liability in favor of another. Ches. & O. R. R. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; C. & O. R. Co. v. Mihas, 280 U. S. 102, 50 S. Ct. 42, 74 L. Ed. 207. See, also, Norfolk, etc., Co. v. Collingsworth, 32 F.(2d) 561 (C. C. A. 6); Norfolk, etc., Co. v. Kratzer, 37 F.(2d) 522 (C. C. A. 6); Carfelo v. D., L. & W. R. R. Co., 54 F.(2d) 475, 477 (C. C. A. 2). It is familiar law that only those may invoke the breach of a statute for whose benefit it was enacted. Exner v. Sherman Power Con. Co., 54 F.(2d) 510 (C. C. A. 2); Akers v. Chicago, etc., Co., 58 Minn. 540, 60 N. W. 669. Those cases do not seem to us anomalous in which a rescuer is allowed to recover against one who imperils the rescued; it is not extravagant to include among the original class to whom the defendant owes a duty, those who may suddenly try to extricate others whom he exposes.

Archaic law did not demand any conscious relation of the actor to the damages for which he was accountable; it was enough that he was their author; fault in the sense of delinquency did not exist. Holdsworth, vol. II, pp. 50–54. There had always been some concessions, and to these were gradually added a limitation to the nearer results, an unconscious recognition of the harshness of holding a man for what he could not conceivably have guarded against, because human foresight could not go so far. Possibly our modern doctrine grew out of this, but if so, it was not deliberate, though specific exceptions were deliberately introduced. Holdsworth, vol. III, pp. 379–382. Be that as it may, we have now for long been accustomed, with some archaic survivals, to the doctrine that imposed liability depends in part upon the conscious attitude which a supposititious normal person would take towards the damage resulting from his acts. Absolute liability for certain kinds of trespass remains; so apparently does that for injury to a third person arising from a deliberate intent to hurt another. James v. Campbell, 5 Car. & P. 372; Talmage v. Smith, 101 Mich. 370, 59 N. W. 656, 45 Am. St. Rep. 414; Isham v. Dow's Estate, 70 Vt. 588, 41 A. 585, 45 L. R. A. 87, 67 Am. St. Rep. 691; Davis v. Collins, 69 S. C. 460, 48 S. E. 469; Carnes v. Thompson (Mo. Sup.) 48 S. W. (2d) 903; Pollock on Torts (12 Ed.) p. 32; Restatement of Torts § 10 (1) Draft 1. To some activities merely as such there still attaches liability, at least in England (Holdsworth, vol. VIII, pp. 468–472); and we have ourselves accepted this in a recent decision [Exner v. Sherman Power Construction Co., supra (C. C. A.) 54 F.(2d) 510]. Indeed this may be the path which the law of torts is destined to follow, led by the conceptions underlying Workmen's Compensation Acts. But so long as it is an element of imposed liability that the wrongdoer shall in some degree disregard the sufferer's interests, it can only be an anomaly, and indeed vindictive, to make him responsible to those whose interests he has not disregarded. We cannot consistently lose sight of the fact that this element relates to the person injured and admits no surrogate. To us, at least as to maritime torts, the matter stands open; being free to choose, we accept the doctrine of Palsgraf v. Long Island R. R. Co., supra, 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253. It results that the respondent's liability to the owner for colliding with the barge is irrelevant to its liability to the underwriter. The facts upon which that putative liability depends include indeed those on which the first liability depends; but it is not itself a juridical factor. This view is in accord

with the entirely satisfactory discussion of Professor Goodhart in 39 Yale Law Review, 449.

The result, however, is so far negative; the respondent may nevertheless be liable, independently of its tort against the owner. That question depends upon whether the tug's careless approach to the barge was itself the breach of some duty to the underwriter, since she knew that it was going for a cargo of coal. Moreover, just as the underwriter may not recover because of the respondent's wrong to the owner, so the respondent may not excuse itself because in the series which connect the underwriter's damage with its act, may be a wrong by the owner. The bargee's neglect, though such a wrong, is to be taken only as part of the nexus, ignoring its tortious quality. As wrong it is irrelevant; as an unlikely event it may be critical. This we have repeatedly held. The George H. Jones (C. C. A.) 27 F.(2d) 665; Cleary Bros. v. Port Reading R. Co. (C. C. A.) 29 F.(2d) 495; Hansen v. E. I. Dupont, etc., Co. (C. C. A.) 33 F.(2d) 94; The Glendola (C. C. A.) 47 F.(2d) 206; The L. R. Connett No. 17 (C. C. A.) 54 F.(2d) 626; Brooklyn, etc., Terminal v. U. S. (C. C. A.) 54 F.(2d) 978. Such notions aside, the usual test is said to be whether the damage could be foreseen by the actor when he acted; not indeed the precise train of events, but similar damage to the same class of persons. Yet this generally accepted canon is more equivocal than appears on the surface. It ignores the excuses for much conduct which is likely to involve damage to others; for we are not bound to take thought for all that the morrow may bring, even when we should foresee it. Our duties are a resultant not only of what we should forecast, but of the propriety of disregarding so much of it as our own interests justify us in putting at risk. It must be confessed therefore that the standard so fixed scarcely advances the solution in a concrete case; it only eliminates the egregious, leaving the tribunal a free hand to do as it thinks best. But that is inevitable unless liability is to be determined by a manual, mythically prolix, and fantastically impractical. In the case at bar it appears to us that the master of the No. 35, in approaching the barge at too great speed, or at the wrong angle, need not have considered the possibility that if he struck her, she might be injured, that her bargee might be so slack in his care of her as to let her be loaded without examination, and might so expose her to the danger of sinking. In the end this may seem merely a fiat, but that is always true, whatever the disguise.

Decree modified as to the owner by limiting the damages to those caused by the collision; decree reversed as to the underwriter and intervening petition dismissed.