### WESTCHESTER FIRE INS. CO. OF NEW YORK v. PENNSYLVANIA R. CO.
#### No. 232.

Circuit Court of Appeals, Second Circuit.
April 18, 1938.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for appellant.

Thomas A. McDonald, of New York City, for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

This is an appeal from an interlocutory decree holding the Pennsylvania Railroad Company liable for cargo damage resulting from the sinking of a barge laden with coal. Libelant is an underwriter asserting by subrogation the rights of the insured owner of the coal.

We must accept the District Court's finding that negligence of a Pennsylvania tug so damaged the coal barge Anthony as to cause her to leak. The bargee gave positive testimony to this effect and the trial judge believed it. But the collision which damaged the barge did not directly damage the cargo. Damage to the cargo resulted from the subsequent sinking of the barge, and this occurred many hours after she was delivered to Byrd Coal Company, which owned the barge as well as her cargo. The appellant contends that the owner, with full knowledge of the Anthony's leaking condition,. failed to take proper steps to keep her afloat, and that this negligence, rather than the prior negligence of the tug, was the proximate cause of the damage to the coal. This is the issue upon which the appeal must turn.

The damage to the Anthony occurred about 9:15 on Sunday morning, January 28, 1934, while she was lying with other loaded barges off a stakeboat off Ellis Island. It caused her to leak badly, and her gasolene pump was immediately started and kept running continuously thereafter for about forty-two hours. On Sunday afternoon a Pennsylvania tug, other than the one which had damaged the Anthony, towed her from the stakeboat to her destination at Calyer street, Brooklyn, placing her within six feet of another coal boat which lay alongside the Byrd Company's dock. Ice prevented putting the Anthony closer to the dock, and no complaint is made of the place where the tug left her. She was left about 6 or 7 p. m., Sunday, and there she remained until she sank on Tuesday morning thirty-five hours later. Although the barge's pump was unable to hold the leak and she was continually settling lower in the water, the bargee asked no assistance from the tug. Upon arrival at Calyer street he reported her condition to her owner, and early Monday morning, about 7 or 8 o'clock, an additional pump was put on board. The two pumps together just held the leak. They were both kept in constant operation until about 3 a. m. Tuesday morning when the bargee heard the Anthony's pump come to a stop. Investigation showed that constant operation since 9:15 Sunday morning had caused the magneto to become fouled with oil, stopping the engine. After working over it for about an hour and a half, the bargee got the pump running again, but in the meantime the water had gained so much that the two pumps could no longer keep the barge afloat. Shortly thereafter the Anthony sank. Her own pump was still running when she went down; the additional pump was taken off just before.

On this state of facts we think the sinking of the barge must be ascribed to the failure of the owner to. take proper precautions for her safety after learning of her leaking condition. During some thirty-five hours' intervening between delivery at the owner's dock and the sinking of the barge, all that was done to protect her was to put on an additional pump which, with the barge's own pump, was

only just enough to hold the leak, if both continued to operate. Nor was the additional pump supplied until twelve hours after arrival. During those twelve hours the Anthony continued to settle deeper. The bargee testified as follows:

"Q. When you got to the wharf you were pretty low in the water. A. Yes. I was going down continually after I was damaged. The longer I would see that they did nothing for us, the deeper I was getting in the water, whereas when I first got damaged the hole wasn't so bad then, but it kept getting worse, more water coming in all the time."

Nevertheless, the bargee did not ask the tug which left him at the wharf to pump out the barge; nor did the owner do anything on Monday to lighten the cargo or syphon out any of the water. The bargee testified that the barge could not have been reached by a tug on Monday because of the ice. But there is nothing to indicate that the owner could not have supplied a larger pump or a greater number of pumps so as to gain on the leak; the barge had four syphon boxes. However, the owner was content to try to keep conditions as they were, with no margin of safety provided in case either pump should fail, as later happened. Nor was the failure of the barge's pump a contingency not reasonably to be foreseen. As the bargee explained, when a pump runs continuously it heats up and the brushes get fouled with oil so that the magneto has to be cleaned. Since such a breakdown as occurred was not unlikely, the owner should at least have supplied a pump or pumps which would do more than just hold the leak. Its failure to do so, or otherwise to protect its leaking barge, was a fault which relieves the appellant from liability for damage to the coal. Although both the initial fault of the tug and the subsequent fault of the barge-owner contribute to the result, the later fault is regarded as the proximate cause of the sinking; hence a libelant, who has full knowledge of the consequences of a respondent's fault and thereafter neglects to take reasonable precautions to avoid them, must bear his own loss. Sinram v. Pennsylvania R. Co., 2 Cir., 61 F.2d 767; The J. G. Rose, 2 Cir., 9 F.2d 917; Eclipse Lighterage & Transportation Co. v. Cornell Steamboat Co., 2 Cir., 242 F. 927. Under these principles the Byrd Coal Company could not have recovered from the appellant for damage to the coal; its underwriter stands in its shoes.

The decree is reversed.