**UNITED AIR LINES EMPLOYEES' CREDIT UNION, Plaintiff**

v.

**THE M\V SANS END, its cargo, freight, equipment,
engines, mast, sails, tackle, furniture,
and all other necessaries appertaining
thereto, and HARRY M. BAARS, Defendants**

**WILLIAM RIZZO, Plaintiff-Intervenor**

High Court of American Samoa
Trial Division

CA No. 17-89

June 4, 1990

Before REES, Associate Justice, TAUANU'U, Chief Associate Judge,
and MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, John L. Ward II
       For Intervenor Rizzo, Charles V. Ala'ilima

This case concerns distribution of the proceeds of the judicial sale of a sailing yacht. Plaintiff Credit Union was the holder of the preferred ship's mortgage whose foreclosure led to the sale. Intervenor Rizzo is the owner of another sailing yacht which was damaged after becoming entangled, both in law and in fact, with the defendant vessel. The principal dispute between the parties concerns the extent to which the doctrines of "intervening negligence" and "last clear chance" in maritime tort actions should be held to have survived the United States Supreme Court's decision in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975).

## I.     Facts and Procedural History

The M/V Sans End, defendant in rem, is a 48-foot wooden trimaran built in 1969. It appears to have been purchased in 1985 by defendant in personam Harry Baars, then a resident of Huntington Beach, California, with the assistance of a $30,000 loan from the plaintiff Credit Union. In 1987 Baars executed a First Preferred Ship Mortgage to secure the balance on the loan, which had increased to about $32,000 due to late payments and refinancing.

Baars promptly fell even further behind on his payments. Apparently seeking a definitive and peaceful resolution of this problem, he then set sail for Hawaii, where, however, the Credit Union soon tracked him down. Baars then made a number of payments; but the balance still hovered around $30,000, and the payments stopped altogether in October of 1988. About two months later Baars and the Sans End turned up in Pago Pago.

The Credit Union somehow managed yet again to find Baars. It retained counsel in American Samoa who instituted the present action, seeking foreclosure of the Preferred Ship Mortgage as well as judgment in personam against Baars for $30,388.69 plus interest, costs, and attorney fees. On March 1, 1989, the Marshal of the High Court served Baars personally with a summons and complaint and also arrested the Sans End.

In the meantime, however, Baars and the Sans End had become involved with intervenor Rizzo and his vessel, the Curved Air.

Upon arriving in Pago Pago Harbor, Baars had moored the Sans End in a location regarded as dangerous by the local yacht community.

Baars was warned by occupants of neighboring vessels that boats moored in this area have a tendency to "drag anchor" in high winds. He nevertheless left the Sans End in this location for an indeterminate period, probably several weeks. On or about January 31, 1989, the vessel did drag anchor and collided with the Curved Air. It is undisputed that this collision resulted solely from the negligence of the Sans End's captain Baars in improperly mooring his vessel. The Curved Air, a 46-foot trimaran of wood and fiberglass construction, suffered chafing and cracking on its starboard float. The anchor lines of the two vessels also became entangled.

In an effort to prevent further damage, Baars lashed his vessel to the Curved Air. He then went to find Rizzo to tell him what had happened and to ask permission to keep the Sans End lashed to the Curved Air until he could untangle the anchor lines. Rizzo gave him one day to do this. Baars, however, did not remove his vessel until about seven days later, after a further incident in which the wind propelled the Curved Air and the Sans End together across the harbor. The boats did not collide with anything this time, but Rizzo complains that his vessel suffered further chafing during the time it was lashed to the Sans End. This he attributes to Baars' incompetent lashing.
Another yachtsman, whose deposition was admitted into evidence, agreed that the boats were not tied tightly enough together and also that "[t]he lines were everywhere. I mean there were lines lying over the water, lying everywhere, screwing all over the boat."

On or about February 7, Baars finally untied the two boats. Rizzo, who was then living and working onshore, went out that evening to inspect the Curved Air. He did not board the vessel but took a quick look around, inspected the coupling by which the Curved Air was attached to her mooring, and saw nothing amiss.

One afternoon a few days or weeks later, the occupants of nearby yachts observed the Curved Air in the process of sinking. Some of these observers went to the boat and others went onshore to find Mr. Rizzo, who soon arrived to oversee the effort to raise the vessel. He and others bailed with buckets until someone arrived with a power-driven suction pump. One of those present dived overboard to inspect the bottom of the boat; he discovered that the rudder had come off, leaving a one-and-one-half inch hole through which water had been allowed to enter. The hole was plugged and the Curved Air was raised, but its interior, equipment, and contents suffered substantial water damage.

97

It is far from clear how the rudder came off. It has not been found. (The water in this part of Pago Pago Harbor affords practically no visibility.) Mr. Rizzo, a boat builder by trade, testified that the rudder and its accompanying shaft were designed not to detach unless the upper housing inside the boat were first removed. He also testified, however, that another one of the people helping him to raise the Curved Air had discovered a loose springline dangling in the water from a starboard cleat. Mr. Rizzo said he did not recognize the line, that it did not belong to him, and that he would never have left a line dangling in the water. He inferred that Mr. Baars must have left the line dangling when he untied the Sans End; that it must have snagged the rudder, and also some other object such as the reef below; and that the line pulled the rudder loose.

The Court has not heard Mr. Baars's version of the story. He never answered the complaint or filed any sort of appearance for himself or the Sans End. He was thought to have left the Territory by the time of trial. The Credit Union took a default judgment against Mr. Baars in the amount of $32,706.35 plus costs and attorney fees; probably it will find him again someday.

Sans End was sold at a judicial auction. The Court originally set a $30,000 reserve bid and ordered that the auction be advertised not only in American Samoa but also in Honolulu, in order to ensure a fair price and minimize the amount of any deficiency judgment against Mr. Baars. Ultimately, however, the vessel brought only $17,000. This sum has been held in the registry of the Court pending the trial of intervenor's claim that he was injured by a maritime tort of the Sans End, is entitled to recover from the proceeds of the sale, and has priority over the Credit Union.

Counsel for plaintiff Credit Union, forced by the procedural posture of the case into the awkward position of defending the hapless Baars, does not propose an alternative theory of what happened to the rudder. Rather, he confines himself (1) to doubting Rizzo's springline hypothesis; and (2) to arguing that, no matter how the rudder came loose, the proximate cause of the water damage was Rizzo's own negligence in not conducting a thorough inspection of the Curved Air after it had been untied from the Sans End.

We find that the detachment of the rudder did result in some way from the lengthy encounter between the Sans End and the Curved Air. Mr. Rizzo proved to our satisfaction that the rudder assembly was

designed and constructed so as not to fall off by itself. There being no particular reason to suspect sabotage, the least unlikely culprit would seem to be one of the many lines hanging beneath the water at various times between January 31 and mid-February --- not only the mysterious springline, but also the entangled mooring lines of both vessels as well as the lines that had been "screwing all over the boat" for a week or so. The rudder may have been caught on one or both of the anchor lines during the time they were entangled; one of these lines may have snagged the rudder as the two boats were dragging anchor across the harbor a few days later. (These mooring lines were evidently strong enough, and the forces at work powerful enough, to drag at least one and possibly two several-hundred-pound anchors all over the harbor bottom.) Or some other line, including but not limited to the springline accused by Mr. Rizzo, may have attached itself to the rudder and also to the reef at some time between January 31 and mid-to-late February. It is impossible to say just when, as the rudder assembly may have taken some time to work its way loose. The resulting leak was a slow one --- we do not know exactly how slow, as no party presented evidence of whether it would have taken hours or days for water entering through a one-and-one-half inch hole to fill a 46-foot boat. The evidence in this case, such as it is, does not *compel* any particular conclusion, but it does *preponderate* in favor of a finding that the loosening of the Curved Air's rudder was caused at least partly by the series of stressful and traumatic events to which she had recently been subjected by the Sans End.

It is also clear, however, that Mr. Rizzo conducted only a cursory inspection of his vessel after the departure of Mr. Baars and the Sans End. He went to the boat only once, at or around dusk when visibility was poor. He did not inspect the starboard side of the boat, where the dangling springline turned out to be, at all. Except for this one visit he left the Curved Air absolutely unattended for an indeterminate period of days or weeks, although he knew of the stresses and traumas we have already discussed. This failure to inspect was almost certainly a cause-in-fact of the swamping. At the very least, a thorough inspection of the Curved Air at any time after it was untangled from the Sans End would have revealed the presence of the dangling springline. If the rudder assembly had already been snagged and damaged or loosened (by the springline, by a mooring line during the dragging incident, or by some other object) this would also have been discoverable. Finally, the boat would not have filled up with water if it had been inspected, attended, or even visited at any time after the slow leak had begun.

99

The relative "proximateness" of these two causes-in-fact of the swamping of the Curved Air, although technically a question of fact, is closely related to certain questions of law. We therefore postpone consideration of proximate cause, as well as the assessment of damages, until after our discussion of these legal issues.

## II.    Jurisdiction and Applicable Law

Actions in the High Court of American Samoa to foreclose ship's mortgages were formerly fraught with confusion and uncertainty.[1] This uncertainty has been resolved by the enactment in 1988 of Public Law 100-710, 102 Stat. 4735 et seq., which repealed the Ship Mortgage Act and substituted Chapter 313 of Title 46 of the United States Code ("Maritime Commercial Instruments And Liens"). The High Court of American Samoa is specifically defined as a "district court" for the purposes of the chapter. 46 U.S.C. § 31301(2)(E), added by P.L. 100-710. The High Court therefore has jurisdiction to enforce a preferred mortgage lien. 46 U.S.C. §§ 31325-26, added by P.L. 100-710.

Upon judicial sale in a civil action in rem brought to enforce a preferred mortgage lien, the preferred mortgage lien has priority over all claims against the proceeds, except for (1) expenses and fees allowed by the court, (2) costs imposed by the court, and (3) preferred maritime liens. 46 U.S.C. § 31325, added by P.L. 100-710. Preferred maritime liens include, inter alia, those for damages arising out of maritime tort. 46 U.S.C. § 31301(5)(B). Intervenor Rizzo's claim therefore takes priority over that of the Credit Union, assuming that Rizzo's damages arose from a maritime tort attributable to the Sans End.

The plaintiff Credit Union concedes that the initial collision was a maritime tort. Plaintiff argues, however, that the swamping of the

---

[1]    See *Security Pacific National Bank v. M/V Conquest*, 4 A.S.R.2d 40 (1985) ["*Conquest I*"] (High Court has jurisdiction to foreclose preferred mortgages under Ship Mortgage Act); *Star-Kist Samoa, Inc., v. The M/V Conquest*, 3 A.S.R.2d 25 41 (1986) ["*Conquest II*"] (High Court is not a "district court of the United States" within meaning of the Ship Mortgage Act and therefore has no jurisdiction to foreclose preferred mortgages under the Act); *Security Pacific National Bank v. M/V Conquest*, 4 A.S.R.2d 59 (1987) ["*Conquest III*"] (Although Ship Mortgage Act does not confer jurisdiction on the High Court, the Court can foreclose ship mortgages under its general admiralty jurisdiction and should give such mortgages the priority to which they would be entitled if foreclosed in a district court of the United States). The 1988 enactment of 46 U.S.C. § 31301(2)(B), discussed in the text, has the approximate effect of superseding *Conquest III*, legislatively overruling *Conquest II*, and reinstating the rule announced in *Conquest I*.

Curved Air, insofar as it was caused by Baars' actions or omissions in tying or untying the boats, gave rise only to damages recoverable against Baars *in personam* and not out of the proceeds from the sale of the Sans End. This is tantamount to arguing that any negligence of Baars was not a maritime tort and was therefore outside the admiralty jurisdiction.

In *Foremost Insurance Co. v. Richardson*, 457 U.S. 668 (1982), the Supreme Court held that claims arising from an accident involving two pleasure boats was within the admiralty jurisdiction. The Court stated that not every such accident would support federal admiralty jurisdiction, but that such jurisdiction would be present when (1) the accident occurred in navigable waters, (2) the conduct alleged to have caused the accident was potentially disruptive of maritime commerce, and (3) the "potential hazard to maritime commerce arises out of activity [e.g., navigation] that bears a substantial relationship to traditional maritime activity," and with respect to which there is a need for uniform rules and a central admiralty authority. *Id.*, 457 U.S. at 675 & n.5. *See also* 46 U.S.C. § 740 (1982) (the "Extension of Admiralty Jurisdiction Act"), extending admiralty jurisdiction to "all cases of damage or injury caused by a vessel on navigable waters."

The rule of *Foremost* and of the Extension of Admiralty Jurisdiction Act has been summed up as encompassing "only those torts that occur on navigable waters and have a sufficient 'maritime flavor.'" *Complaint of Sheen*, 709 F. Supp. 1123, 1129 (S.D. Fla. 1989). Courts have determined whether a tort had "maritime flavor" by reference to the parties, the sorts of vessels or other objects involved, the nature and cause of the injury, and the implications for traditional concepts of admiralty law. *See id.* at 1129 (citing *Kelly v. Smith*, 485 F.2d 520, 525 (1973)).

In the present case all these factors militate in favor of the determination that this was a maritime tort. Mr. Rizzo's damages arose from the near-sinking of an ocean-going vessel, in a harbor which is not just a navigable waterway but one of the busiest and most important centers of commercial shipping within a radius of several thousand miles. The incident was alleged to have resulted from an act or acts of incompetent seamanship by the captain of another ocean-going vessel, done in the course of attempting to prevent further damage after a collision between the two vessels.[2] Even if these two vessels can be

---

[2]  The initial collision between the two boats appears to have been a cause-in-fact

characterized as "pleasure boats," the implications for maritime commerce and the relationship of the activity --- lashing and unlashing two fifty-foot vessels that have collided in a busy harbor --- to traditional admiralty concerns are at least as pronounced as they were in the incident that gave rise to the Supreme Court's decision in *Foremost*.[3] We conclude that the negligence of Mr. Baars, acting as captain of the Sans End, was a maritime tort. Damages, if any, are recoverable *in rem* against the vessel as well as *in personam* against owner/captain/tortfeasor Baars.

The Sans End having been judicially sold, Mr. Rizzo has a preferred maritime lien against the proceeds for any damages attributable to the maritime tort. This lien is superior to that arising from the Credit Union's preferred mortgage.

---

of the later swamping of the Sans End. This is true even if the swamping was caused not by any direct contact between the boats or their lines during the time they were lashed together, but by Baars' negligent failure to remove the springline a week after the collision. Were it not for the collision, Baars would never have been on the Curved Air tying and untying lines.

It is by no means essential to the Sans End's liability in rem, however, that its captain's negligence have had anything to do with a collision. If the two vessels had been lashed together for *any* reason having the requisite impact on the traditional concerns of admiralty law (e.g., for necessary repairs or protection from a storm), the Sans End would still be liable in rem for damage occasioned by the negligence by its captain in the lashing or unlashing.

> While the collision claims and the personal injury claims . . . account for the great bulk of maritime line tort litigation, it seems on principle that any kind of maritime tort connected with the ship or its use for which those in control of the ship are responsible should create a lien . . . . [It has been held that] any conduct which is tortious under the general law and which is connected with the ship or its use creates a maritime lien.

Gilmore & Black, *The Law of Admiralty* § 9-19 at 628-29 (citing *State of California v. S/S Bournemouth*, 307 F. Supp. 922 (C.D. Cal. 1969)) (negligent discharge of oil into navigable waters gave rise to maritime lien against vessel). *See generally* authorities cited in Gilmore & Black, *supra*, § 9-19 at 629 nn. 95b & 95c.

[3] One of the boats in *Foremost* was "used for pleasure boating, such as boat riding and water skiing, and at the time of the accident the boat was actually pulling a skier on a zip sled." 457 U.S. at 670. The other was "described as a bass boat." *Id.* They collided on the Amite River, a stream that was "assumed" to be navigable but was "seldom, if ever, used for commercial traffic." *Id.* at 670 n.2. Neither the boats, the owners, the drivers, nor the passengers had anything to do with maritime commerce. *Id.* at 670-71.

### III. Comparative Negligence, Intervening Negligence, and Last Clear Chance

Plaintiff contends, however, that the damage that occurred during the swamping of the Curved Air was not caused by Mr. Baars at all --- not even if Baars did negligently leave the springline, and not even if it did pull the rudder from its housing. More precisely, plaintiff urges that even if such negligence was in fact a cause of the swamping, as a matter of law the only "proximate" cause was the later failure of Mr. Rizzo to inspect the Curved Air and to take remedial measures.

In support of this proposition plaintiff cites two cases in which boats were tortiously damaged, were later taken into the possession of their owners, and eventually sank after the owners failed to conduct such inspections or make such repairs as would have prevented them from sinking. In each case it was held that "[t]he proximate cause of the sinking . . . was not the collision but the intervening negligence of the owner in failing properly to tend his vessel." *Danos v. The Henry Louis*, 159 F. Supp. 640, 642 (E.D. La. 1958) (Wright, J.); *see also Sinram v. Pennsylvania Ry. Co.*, 61 F.2d 767, 768 (2d Cir. 1932) (L. Hand, J.). Plaintiff contends that Rizzo's failure to inspect similarly "intervened" and thereby prevented Baars's earlier negligence from being a proximate cause of the sinking.

Before considering the present force and scope of the doctrine of "intervening negligence" in admiralty law, we note that the two cases cited are distinguishable on their facts from the present case. In *Danos*, as in *Sinram*, the owner took custody of the boat *after* the boat had been damaged by a calamitous event, and with full knowledge of that event. It is hardly "reasonable foreseeable," from the standpoint of the original tortfeasor, that an owner so apprised and so situated would not immediately conduct a thorough inspection and take all appropriate remedial measures. Moreover, such an owner is in a far better position to prevent any further damage than the original tortfeasor, who is probably no longer in a position to do anything for good or ill. Finally, in both *Sinram* and *Danos* the owner committed some affirmative act that contributed to the sinking: in *Sinram* the owner loaded the boat without inspecting it (*see* 61 F.2d at 768) and in *Danos* the vessel sank when "some caulking in the hull . . . required as a result of the collision, gave way." 159 F. Supp. at 642. Such facts afford good reasons to allocate sole responsibility to the owner for the sinking, without the need for any blanket rule or special doctrine about owners of damaged boats.

The case before us affords no such reasons. At the time Baars untangled his boat from the Curved Air, leaving the latter in the constructive possession of Rizzo, the dangling springline had not yet caused any damage at all. Rizzo was unaware of the dangling springline until after the boat had already sunk, and had no particular reason to suspect its presence. (The owners in *Sinram* and *Danos*, in contrast, had actual knowledge of the prior tortious conduct that eventually sank their ships.) Baars, who evidently did know about this continuing threat to the safety of the Curved Air, continued to be in a position to do something about it --- if only to tell Rizzo --- even after he had unlashed the Sans End and moved a few hundred feet down the harbor. Moreover, Rizzo's inattentiveness was quite foreseeable to Baars, who knew or had reason to know that Rizzo rarely visited the Curved Air. Although these facts do not entirely absolve Rizzo from responsibility for the consequences of his inattentiveness, they do suggest that this inattentiveness should not absolve Baars from the consequences of his own negligence.[4]

The doctrine of intervening negligence, in the "strong" sense in which it is advanced by the present plaintiff, is conceptually indistinguishable from that of "unconscious last clear chance," according to which the party whose negligence came last in time is held solely responsible even though his negligence consisted solely in not paying attention to the situation occasioned by the other party's prior fault. *See Prosser & Keeton on Torts* § 66 (5th ed. 1984).

Both the doctrine of intervening negligence and that of last clear chance can be justified as special instances of the principle that an act or omission, although it was one of the causes of a certain result, may yet have borne such a trivial or attenuated relationship to the result that it would be unsound public policy to hold the actor liable. Such an act or omission, although a "cause in fact" of an event, is held not to be among the "proximate" causes. As special instances of general principles will do, however, these doctrines have sometimes threatened to exceed the limits of their logic. "Unconscious last clear chance," like the strong version of intervening negligence being asserted in this case, has the effect of absolving a party from the consequences of his negligence even when it was reasonably foreseeable that such negligence would combine with another person's later negligence to cause disastrous consequences;

---

[4] "The risk created by the defendant may include the intervention of the foreseeable negligence of others. . . . [O]nce it is determined that the defendant has a duty to anticipate the intervening misconduct, and guard against it, it cannot supersede the defendant's liability." *Prosser & Keeton on Torts* § 44 at 304-05 (5th ed. 1984).

and even when the two parties seem equally culpable and equally "connected" to the ultimate result.

It is generally agreed that the vitality of such doctrines as intervening negligence and last clear chance owe much to their utility as partial substitutes for the allocation of liability according to comparative fault. *See Prosser & Keeton, supra*, § 66 at 469-70. At common law they have been used to mitigate the harshness of the doctrine of contributory negligence, whereby a party who was greatly injured and slightly negligent might otherwise be unable to recover from a far more culpable party. In the law of admiralty these and other doctrines have been regarded as antidotes to the "divided damages rule," whereunder the damage caused by an accident was divided equally among all parties regardless of their degree of culpability. *See Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069, 1075 (11th Cir. 1985); *Prudential Lines, Inc. v. McAllister Brothers, Inc.*, 801 F.2d 616, 620-21 (2d Cir. 1986); Note, *Admiralty: Comparative Negligence in Collision Cases*, 36 La. L. Rev. 288, 295-96 (1975).[5]

The divided damages rule was abandoned by the United States Supreme Court in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975). The Court substituted a rule by which liability is to be apportioned among the parties according to their comparative degree of fault. *Id.* at 260-62. It was immediately suggested that the next step should be to "abrogate those rules which were developed to protect the slightly negligent party from bearing an inequitable share of the damages." Note, *supra*, 36 La. L. Rev. at 295. With respect to the rules of intervening negligence and last clear chance, the federal courts seem thus far to agree. As the Eleventh Circuit observed in *Hercules, Inc. v. Stevens Shipping Co., supra*:

---

[5]     Judge Learned Hand, who appears to have imported the doctrine of intervening negligence into admiralty with his *Sinram* opinion, was perhaps the most outspoken judicial critic of the divided damages rule. *See, e.g., National Bulk Carriers v. United States*, 183 F.2d 405, 410 (1950) (Hand, J., dissenting):

> An equal division in this case would be plainly unjust; they ought to be divided in some such proportion as five to one. And so they could be but for our obstinate cleaving to the ancient rule which has been abrogated by nearly all civilized nations.

*See also Chemical Transporter, Inc. v. Turecamo, Inc.*, 290 F.2d 496 (2d Cir. 1961) (L. Hand, J.) (last clear chance doctrine applied to relieve a plaintiff whose negligence was "trifling" from sharing in liability according to the divided damages rule).

Under a 'proportional fault' system, no justification exists for applying the doctrines of intervening negligence and last clear chance. . . . Unless it can truly be said that one party's negligence did not in any way contribute to the loss, complete apportionment between the negligent parties, based on their respective degrees of fault, is the proper method for calculating and awarding damages in maritime cases . . . . The doctrines of intervening negligence and last clear chance should not be used to circumvent this 'proportional fault' concept.

*Id.*, 765 F.2d at 1075 (citations omitted). *Accord, Prudential Lines, Inc. v. McAllister Brothers, Inc., supra,* 801 F.2d at 21 (2d Cir. 1986) ("The disease of divided damages having been destroyed, the balm of last clear chance has become superfluous."); *Complaint of Sheen,* 709 F. Supp. 1123 (S.D. Fla. 1989).

This is not to say that the circumstantial distinctions represented by the ideas of last clear chance and intervening negligence are no longer important. Rather, the proportional fault principle announced by *Reliable* comprehends these distinctions, making it unnecessary for them to be embodied in separate rules. Indeed, the proportional fault model accommodates a far wider range of situations than the divided-damages-cum-mitigating-doctrines model, despite having fewer moving parts. Last clear chance and intervening negligence made it possible to impose the whole burden on the more negligent party, which in many cases was more just than forcing the less negligent party to pay half the damages. The *Reliable Transfer* rule that "liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault" (421 U.S. at 411) preserves both of these options and also provides for situations in which justice was represented by neither.

In the present case neither Baars nor Rizzo was more negligent than the other. Baars left a harmless-looking line hanging into the water from another person's boat. The possibility that it would catch on something and thereby damage the boat, while perhaps not a likely one, is nevertheless the very reason competent sailors do not leave ropes hanging off of boats. Baars should have foreseen this possibility and guarded against it. Similarly, Mr. Rizzo took a brief look at his boat and, seeing nothing wrong, postponed indefinitely any further inspection. The possibility that danger might be lurking just below the surface,

although hardly ever an actuarial probability, is the reason careful boat owners inspect their vessels more thoroughly than Mr. Rizzo did. Moreover, each man had reason to suspect that the other would behave more or less as he did: Mr. Rizzo knew from painful experience that vessels coming into contact with Mr. Baars tended to emerge in less than ship shape, and Mr. Baars knew or should have known that Mr. Rizzo had not been paying much attention to his boat lately. Neither was grossly negligent, but each was clearly negligent. We assess the proportional fault of each at fifty per cent.[6]

## IV.    Damages

The Curved Air was damaged twice: first by the collision, for which Mr. Baars and the Sans End are solely responsible and for which Mr. Rizzo may recover one hundred per cent of his damages; and later by the swamping, for which Mr. Rizzo himself was fifty per cent responsible and for which he may therefore recover only fifty per cent of his damages.

In his initial report a week after the collision, Mr. Rizzo estimated his damages (cracking and chafing of the starboard float, including some damage alleged to have been caused by improper lashing after the collision) at $700. By the time of trial he had revised this estimate to $1000. Although the sole basis for each of these figures was Mr. Rizzo's estimate of the value of his own labor, plaintiff concedes that this damage amounted to between $500 and $1000. We assess damages from the collision, together with any minor damage to the same part of the boat caused by improper lashing, at $700.

---

[6]    The foregoing analysis assumes that the rudder assembly was pulled loose by the dangling springline, as intervenor Baars alleges. In our discussion of the facts we found that the loosening was most probably caused *either* by the springline *or* by some contact between the vessels, their lines, and/or some other object or objects during the initial collision or the subsequent period when the boats were lashed together. *See* Part I, *supra*. If the accident happened in the latter way, the facts are closer to the *Danos/Sinram* situation. Because Mr. Rizzo actually knew about the collision and the subsequent dragging of the two boats across the harbor, his failure to inspect and repair would constitute greater fault with respect to damage caused by these events than with respect to damage caused by the springline, of which he knew nothing. On the other hand, Baars' negligence in risking the initial collision was also greater than his subsequent negligence in leaving a line hanging from the cleat of the Curved Air. In either case, therefore, we assess fault at fifty per cent for each party.

107

The evidence presented with respect to damage caused by the swamping is more complex without being much more precise. In his amended complaint Mr. Rizzo estimated his total damage (excluding a $10,000 claim for "emotional distress," but including his claim for damage caused by the initial collision) at $15,000. He has revised this estimate to include $ 8751 for damaged equipment, exclusive of his estimate of what it will cost to install such equipment; $13,468 for labor, including installation of equipment; and $2300 for damaged books, charts, and clothing. The new total is $ 24,520, exclusive of emotional distress and of his $1000 claim for damage caused by the initial collision.

These estimates are fraught with difficulties. Mr. Rizzo has estimated the damage to his equipment at its purchase price when new; the items for which receipts were available, however, were purchased between four and six years prior to the accident. Because such equipment depreciates in value over time, the estimates appear to be far greater than the diminution in value of the used equipment resulting from the accident --- even on the unlikely assumption that every damaged piece of equipment was thereby rendered useless and valueless. The $1000 worth of clothes, according to the undisputed account of plaintiff's counsel, turned out to consist of "one suit of clothes and a small box of soiled clothing . . . with the statement that the rest had been returned to the States for cleaning." The $1300 worth of books and charts filled another box. The largest single category of damages, $ 13,468 for repairs and installation, appears to consist entirely or almost entirely of the value of Mr. Rizzo's own labor, and the sole evidence for this figure was Mr. Rizzo's own testimony. Although Mr. Rizzo was clearly damaged by the accident, and although his damages were clearly far more than zero, the evidence presented is not conducive to a more precise estimate of the actual figure.

A less problematic starting point is Mr. Rizzo's own estimate of the diminution in the market value of the Curved Air. He estimates that the boat was worth $50,000 immediately before the initial collision and $38,880 immediately after the swamping. Although both these estimates seem high, at least for a boat located in Pago Pago --- the Sans End, a vessel of approximately the same size and type as Mr. Rizzo's, somewhat older but in reasonably good condition, assiduously advertised locally and abroad, brought $17,000 --- the proportional diminution in value (22.4%) seems consistent with the evidence of the damage to the vessel and its equipment.

We estimate that the market value of the Curved Air was $35,000 immediately before the collision, $27,160 ($35,000 less 22.4%) immediately after the swamping. The damage caused to the vessel, including its equipment, by both incidents would thus amount to $7840. $700 of this amount has been assessed as the damage caused by the collision. This leaves $7140 as the diminution in value of the vessel and its equipment as a result of the swamping. We also assess $100 for damaged clothes, $100 for books, and $200 for charts, for a total of $7540 in damages from the swamping.

We therefore calculate the total amount of Mr. Rizzo's recovery as follows:

Collision damages:
100% x $700 = $ 700.
Damages from swamping:
50% x $7540 = $ 3770.
Total recovery: = $ 4470.

V. *Costs and Fees*

Plaintiff incurred substantial costs in securing the Sans End during the time it was *in custodia legis* prior to the judicial sale. These costs are recoverable from the proceeds of the sale and have priority over the recovery of either party. *See* 46 U.S.C. § 31326, added by P.L. 100-710 (1988). We assess these costs (including attorney fees related to securing and selling the vessel but not those attributable to pressing plaintiff's claim against defendant Baars in personam or to resisting the claims of the intervenor) at $8249.

The default judgment already rendered in favor of plaintiff Credit Union against defendant in personam Baars included costs and attorney fees as provided in the contract between the parties. Because the proceeds of the judicial sale are extremely limited, we assess no attorney fees (other than those included in the costs of maintaining the vessel *in custodia legis*) on behalf of plaintiff against the defendant in rem.

Because of the limited size of the fund and because the intervenor's claim arose from an event partly attributable to his own fault, we award no attorney fees to intervenor Rizzo.

109

## VI.  Conclusion

Plaintiff Credit Union shall have judgment against defendant in personam Baars in the amount of $32,706.35 plus $10,416.00 for costs and attorney fees, a total of $43,122.35; the judgment to bear interest at the contract rate of 15 per cent per annum from April 20, 1989.

Intervenor Rizzo shall have judgment against defendant in personam Baars in the amount of $4,470 plus $55 in court costs, a total of $4525; the judgment to bear interest at the legal rate of 6 per cent per annum from June 4, 1990.

The judicial sale having effected a release of all claims against defendant in rem Sans End, and the claims thus terminated having attached in the same amounts and in accordance with their priorities to the proceeds of the sale, plaintiff and intervenor shall recover the following amounts from the proceeds in lieu of judgment against the defendant in rem, in the following order of priority:

1) Plaintiff Credit Union, $8249 for the cost of securing the vessel while *in custodia legis*;

2) Intervenor Rizzo, $4470 plus court costs in the amount of $55, a total of $4525;

3) Plaintiff Credit Union, the balance of the proceeds (about $5000) up to the amount of its judgment against defendant in rem Baars exclusive of attorney fees.

It is so ordered.